**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

|  |  |
|---|---|
| TERRY ADIRIM, | |
| Plaintiff, | |
| v. | No. 1:25-cv-768 (MSN/WBP) |
| U.S. CENTRAL INTELLIGENCE AGENCY, *et al.*, | |
| Defendants. | |

**FEDERAL DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER**

On April 4, 2025, the Central Intelligence Agency ("CIA") informed Plaintiff Terry Adirim that the agency was going to exercise the clear and unequivocal term in her employment contract to terminate her employment with the CIA within thirty days "for any reason." Four weeks later—a single day before her termination went into effect—Plaintiff filed suit in this Court against the CIA and Director John Ratcliffe ("the Federal Defendants") and moved for the "extraordinary relief" of a temporary restraining order to halt her termination. The majority of Plaintiff's Complaint, and the entire basis of her instant motion, is taken up by a speculative and unsupported theory as to why she was terminated that has no relation to actual events. Plaintiff pinpoints the blame not on the CIA, but on a non-governmental actor, Ivan Raiklin, whom she accuses of orchestrating her termination through a scheme of defamation and political influence. Besides being farfetched—and untrue—Plaintiff's allegations do not actually amount to any viable claim against the Federal Defendants, let alone any claim that merits an injunction. To gain such relief, Plaintiff must make a "clear showing" at this stage of her likelihood of success, her irreparable injuries, and that the balance of equities in granting relief favors both her and the public interest. As explained below, Plaintiff cannot make the requisite showing for any of her claims. Accordingly, Federal Defendants respectfully request that this Court deny Plaintiff's motion.

## LEGAL STANDARD

Plaintiff seeks a temporary restraining order—"an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Such a request "involv[es] the exercise of a very far-reaching power to be granted only sparingly and in limited circumstances." *Sarsour v. Trump*, 245 F. Supp. 3d 719, 728 (E.D. Va. 2017). To be eligible for a temporary restraining order, Plaintiff must demonstrate each of the following factors by a "clear showing": (1) a likelihood of success on the merits; (2) irreparable harm in the absence of

preliminary injunctive relief; (3) the balance of equities between the parties tips in favor of the party seeking such relief; and (4) the public interest favors equitable relief. *Winter*, 555 U.S. at 20, 22. The requirement for showing a clear likelihood of success on the merits "is far stricter than a requirement that the plaintiff demonstrate only a grave or serious *question* for litigation." *Sarsour*, 245 F. Supp. 3d at 729 (alterations and quotation marks omitted) (emphasis in original).[1]

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Background.

At the outset of the COVID-19 pandemic, i.e., in March 2020, Plaintiff served as the Acting Assistant Secretary of Defense for Health Affairs at the Department of Defense ("DoD"). Compl. ¶ 1, Dkt. 1. In that role, Plaintiff advised the Secretary of Defense that members of the armed services should receive COVID vaccines. *Id.* ¶ 2. In September 2021, Plaintiff signed a memorandum addressed to various high-ranking DoD officials regarding which COVID-19 vaccines DoD health care providers could use to vaccinate service members given the vaccines' respective levels of approval by the Food and Drug Administration. *See* Ex. 2. Over a year later, on September 27, 2022, Breitbart News published an article criticizing Plaintiff's memorandum, discussing the legal differences between the two vaccines at issue, and reporting on service members who were involuntarily discharged from the military as a result of their vaccination

---

[1] Some of Federal Defendants' cited cases arise in the context of a motion for preliminary injunction as opposed to a temporary restraining order. These apply equally to the motion before the court, since "[t]he standard for granting either a TRO or preliminary injunction is the same." *Toure v. Hott*, 458 F. Supp. 3d 387, 396 (E.D. Va. 2020). Further, The Court should exercise its discretion to convert Plaintiffs' motion to one for a preliminary injunction because Federal Defendants have "had a fair opportunity to oppose it." *U.S. Dep't of Lab. v. Wolf Run Mining Co.*, 452 F.3d 275, 283 (4th Cir. 2006) ("[A] district court could properly consider a motion for a TRO as a request for a preliminary injunction, . . . focusing not on a specific time period but on whether the opposing party had a fair opportunity to oppose it.").

status.  Ex. 3.[2]

On December 16, 2024, Plaintiff signed an employment contract with the CIA to serve as the Director of the CIA's Center for Global Health Services.  Decl. of Brenda McKinlay, CIA Deputy Chief Operating Officer ¶ 4, Ex. 1; *see also* Compl. ¶ 28; Dkt. 1-5.  Under the terms of the contract, Plaintiff's employment contract with the CIA could be terminated "[u]pon thirty (30) days notice by either party for any reason."  Ex. 1 ¶ 4; Dkt. 1-5 at 4; *see also* Compl. ¶ 46.  By March of 2025, Plaintiff had already become the subject of a number of concerns at the CIA.  Ex. 1 ¶ 6.  For example, Plaintiff's conduct had already generated multiple complaints by several different CIA officers regarding alleged inappropriate and harassing statements and actions by Plaintiff's towards them in the workplace.  Moreover, these issues had first arisen almost immediately after Plaintiff's began working at the CIA and additional allegations continued to accumulate throughout.  *Id.*   By mid-March 2025, a range of concerns relating to Plaintiff came to the attention of CIA's senior-most leadership.  *Id.*

The result of CIA's review of concerns regarding Plaintiff—only months into her new position—led CIA to exercise the termination provision of her contract.  *Id.* ¶ 6–7.  CIA's decision was not related Laura Loomer, Ivan Raiklin, or Plaintiff's prior role with respect to DOD's COVID vaccine policy.  *Id.* ¶ 7.  CIA officials communicated the termination decision to Plaintiff on April 4, 2025, at which point—consistent with long-standing agency practice given access to sensitive national security information—she was put on administrative leave for 30 days.  *Id.* ¶ 8.  Plaintiff was aware that she was being terminated pursuant to the clause in her contract that gave either party the right to do so upon thirty days' notice.  Compl. ¶ 35.  Nor did CIA's internal regulations

---

[2] Available at https://www.breitbart.com/politics/2022/09/27/exclusive-dod-wouldnt-let-troops-wait-fda-approved-vaccine-before-punishing-them/ (last visited May 5, 2025).

provide any additional procedural protection to Plaintiff; indeed, under the agency's regulations governing termination of employment (titled "AR 4-16"), contract employees are subject to termination simply pursuant to the terms of their employment contract. *See* Ex. 4 at ¶ B.2 ("For contract employees, the term clause of the contract relating to termination of employment prior to the expiration of the contract will govern termination."). And "[c]ontract employees . . . have no right of appeal" as to their termination decision. *Id.* ¶ E.1.

On April 8, 2025, Breitbart News published another online article that referenced Plaintiff, titled "Exclusive: Senior CIA Official Who Facilitated Biden's Military COVID-19 Vaccine Mandate Fired." Ex. 5 at 1. Regarding Plaintiff's termination, the article stated that:

> Terry Adirim, a senior Central Intelligence Agency official and former senior defense official who played a pivotal and potentially illegal role in the Biden Administration's military vaccine mandate, was recently fired from the agency, a source has exclusively revealed to Breitbart News.

*Id.* The article went on to state that Plaintiff's "firing was related to her role in forcing service members to choose between taking a vaccine that was under Emergency Use Authorization or being kicked out, according to the source." *Id.* The article then referenced Plaintiff's September 2021 memorandum issued during her tenure at the DoD and noted that "[h]er memo was considered legally dubious even inside the Pentagon, as Breitbart News reported in September 2022"—referring to Breitbart's previous article mentioning Plaintiff. *Id.* at 2. The April 2025 article then repeated much of the same ground as its 2022 article, including its legal analysis of Plaintiff's September 2021 memorandum. *Id.* at 1–3. Breitbart's source is not identified in the article in any way.

### B. Plaintiff's Alternative Theory.

Contrary to the above, Plaintiff instead speculates that she was terminated from her position at the CIA because of defamatory statements made by a non-governmental actor, Ivan Raiklin. In

short, Plaintiff believes that Mr. Raiklin, who she describes as a "political extremist," asked his "close associate" and fellow "political extremist" Laura Loomer, to ask President Trump to fire Plaintiff; that Ms. Loomer did so; and that President Trump acceded to her request; and that the CIA knowingly terminated Plaintiff *because of* Mr. Raiklin's defamatory statements. Plaintiff's theory relies almost entirely on inferences drawn from timing and supposed connections between individuals that are simply unsupportable. The lengthy "chain" of events on which Plaintiff relies—and the putative support for her speculation—is as follows:

- In October 2023, Ivan Raiklin and Laura Loomer appeared in separate interviews recorded at the October 13–14, 2023 ReAwaken America Tour event in Miami, Florida. Compl. ¶ 24.[3]

- Sometime in July 2024, Mr. Raiklin compiled and/or published a list of individuals "he considers guilty of treason" that included Plaintiff. Compl. ¶ 25; *see also* Ex. 6.[4]

- On October 3, 2024, Mr. Raiklin appeared as a guest on a podcast, where he discussed Plaintiff and stated that she would be "criminally liable and . . . face consequences for

---

[3] Plaintiff alleges that Mr. Raiklin and Ms. Loomer are "close associates" and as an example offers only that they participated as "the featured speakers in a "ReAwaken America Tour" and cites to the video recording. Compl. ¶ 24 (citing Clay Clark's ReAwaken America Tour ("Tour Video") (Oct. 21, 2023), available at https://subsplash.com/u/-RT4DVC/media/embed/d/fsqfnyv?logo Watermark=0). The actual video does little to establish that they are "close associates," let alone that they were both aware of each other's presence in the same location—they are merely each interviewed by the same individual at separate times. Ms. Loomer and Mr. Raiklin do not appear on screen together, neither mentions the other in their interview, and the interviews are screened twenty minutes apart. *See* Tour Video at 14:35–22:30 (Ms. Loomer's interview); *id.* at 41:09–48:23 (Mr. Raiklin's interview). The only other evidence Plaintiff provides that the two knew each other is Mr. Raiklin's public tweet six months' later stating that he respects Ms. Loomer. Compl. ¶ 32; Dkt. 1-2.

[4] Much of Plaintiff's information appears to come from a November 2024 article published in *The Atlantic* titled "Trump's Secretary of Retribution. *See* Ex. 6, available at https://www.theatlantic.com/politics/archive/2024/11/trump-secretary-of-retribution-ivan-raiklin/680494/ (last visited May 5, 2025). It is unclear where Plaintiff got the July 2024 date from. Other articles, suggest that Mr. Raiklin's list—referred to as his "Deep State Target List"—was circulating online as early as January 2024. *See* Ex. 9 at 2, available at https://www.rawstory.com/raw-investigates/ivan-raiklin/ (last visited May 6, 2025).

genocide and for mutilation."[5]   He also referred broadly to individuals within the so-called "deep state" as "war-criminal scum."  *Id.*

- On December 22, 2024, Mr. Raiklin re-tweeted another individual's post about Plaintiff having a "SES position in our USG" to the President and other individuals, with the message "[i]s the architect of the illegal DOD CCP-19 Jab Genocide Mandate Terry Adirim burrowing in at the CIA?"  Compl. ¶ 28; Dkt. 1-1.

- On March 31, 2025, Elon Musk visited the CIA's headquarters.  Compl. ¶ 31.  *Plaintiff does not explain the significance of this event or why it is relevant to her claims.*

- On April 2, 2025, Laura Loomer visited President Trump at the White House, where according to the New York Times, she "laid out a list of people she believed were disloyal to the President."  Ex. 7; Compl. ¶ 32.

- On April 3, 2025, the New York Times reported that President Trump fired six officials from the National Security Council, including Michael Waltz, Brian Walsh, Maggie Dougherty, Thomas Boodry.  Compl. ¶ 32.  Ex. 7.  *No mention was made of Plaintiff or any other CIA officials.*

- That same day, Mr. Raiklin tweeted, in response to reports of Ms. Loomer's White House visit, "[f]or the record I respect Laura Loomer and her work."  Compl. ¶ 32; Dkt. 1-2.

- On April 4, 2025, Ms. Loomer tweeted that she referred the NSA Director General Timothy Haugh and "his deputy, Wendy Noble" to President Trump for firing.  Compl. ¶ 33; Dkt. 1-3.  *Ms. Loomer did not mention Plaintiff in her tweet or that she had referred anyone at the CIA to President Trump for firing.*

- That same day, the CIA informed Plaintiff that the agency was terminating her contract under the thirty-days notice provision.  Compl. ¶ 35.

- On April 5, 2025, CNN published an online article that quoted President Trump as stating that Ms. Loomer "recommended some people for jobs" and that "sometimes I listen to those recommendations, like I do with everybody, I listen to everybody, and then I make a decision."[6]  Ex. 8.

---

[5] The quotations Federal Defendants insert in his bullet point are transcribed directly from Mr. Raiklin's statements on Roseanne Barr's podcast, the full video of which is available at https://www.youtube.com/watch?v=PHU25j6eyX4 (last visited May 6, 2025) and referenced in Plaintiff's Complaint at ¶¶ 26–27.

[6] Plaintiff alleges that "on April 4, 2025, President Trump stated that he spoke with Loomer on April 3 and listened to her 'hiring recommendations,'" Compl. ¶ 34, but the actual article she cites in support is more nuanced and reports that the President "acknowledged meeting with Loomer but downplayed her role in the dismissal of National Security Council staff."  *See* Ex. 8, available

- On April 8, 2025, Mr. Raiklin retweeted a post of the Breitbart News article published that same day regarding Plaintiff's termination from the CIA, along with the message "Deep State Target List member." Dkt. 1-4; *see* Ex. 5.

- That same day, Donald Trump Jr., the son of President Trump and a private individual not employed by the federal government, tweeted a screenshot of the Brietbart News article about Plaintiff's termination along with the message "Bye bye" and a hand-waving emoji. Dkt. 1-6. The screenshot included a picture of Plaintiff and the headline "Exclusive: Senior CIA Official Who Facilitated Biden's Military COVID-19 Vaccine Mandate Fired."[7] *Id.*; Ex. 10.

Based on this series of allegations, Plaintiff surmises that "Defendants CIA and its director cravenly fired Plaintiff on the basis of libel and slander from an unhinged man [i.e., Mr. Raiklin], violating her due process rights and breaching their contract with her, and then leaked private information about her, violating the Privacy Act, defaming her in the bargain." Pl.'s Mot. at 3, Dkt. 4. As detailed below, this holds no water.

### C. Procedural History.

On May 2, 2025—four weeks after the CIA informed Plaintiff that she would be terminated and a day before her anticipated termination—Plaintiff filed her Complaint in the instant case, naming the CIA, its Director, John Ratcliffe (together "Federal Defendants"), Ivan Raiklin, and America's Future Inc. (the non-profit organization Mr. Raiklin serves as a board member for) as Defendants. *See* Dkt 1. As against the Federal Defendants CIA and Director Ratcliffe, Plaintiff asserts three claims: (1) violation of the Fifth Amendment's Due Process Clause for terminating her employment and allegedly telling Breitbart News that she was fired due to "'potentially illegal' activity"; (2) breach of contract for terminating her employment contract based on Mr. Raiklin's

---

at https://www.cnn.com/2025/04/05/politics/laura-loomer-donald-trump-meeting/index.html (last visited May 5, 2025).

[7] Donald Trump Jr.'s tweet does not appear to link to the actual article—i.e., it displays only a picture of the article's headline. *See* Ex. 10, available at https://x.com/donaldjtrumpjr/status/1909640009218392488?s=51 (last visited May 6, 2025).

allegedly defamatory statements and tortious interference; and (3) violations of the Privacy Act for allegedly disclosing information about her hiring and firing to Breitbart News.  Compl. ¶¶ 42–49. Plaintiff also asserts tort claims against Mr. Raiklin and/or America's Future for defamation, intentional infliction of emotional distress, conversion, and tortious interference with contractual relations.  *Id.* ¶¶ 50–64.  As relief, Plaintiff seeks over $75,000 in compensatory damages, injunctive relief, statutory damages, punitive damages, and attorneys' fees.  *Id.* at 15.

The same day Plaintiff filed her Complaint, she moved the Court for injunctive relief against the Federal Defendants, seeking the extraordinary remedy of a temporary restraining order ("TRO") to prevent her termination that was set to occur effective May 3, 2025.  Dkt. 3.  On May 3, 2025, the Court ordered an administrative stay in the case and that the Federal Defendants "refrain from terminating Plaintiff or otherwise altering her employment status" until further order of the Court.  Dkt. 6.  On May 5, 2025, the Court held a hearing on Plaintiff's motion for a TRO and heard oral argument.  At the end of the hearing, the Court ordered the parties to submit further briefing on the Plaintiff's motion and scheduled another hearing for Friday, May 9, 2025.

## ARGUMENT

In her motion for a temporary restraining order, Plaintiff seeks relief as to all three of the claims she asserts against the Federal Defendants.  However, as outlined by undersigned counsel at the May 5, 2025 hearing before the Court, Plaintiff has not made a clear showing of her right to relief on any of the three claims.  In fact, for two of Plaintiff's three claims, she cannot obtain injunctive relief as a matter of law—whether on an emergency basis or otherwise.   Injunctive relief is not an available statutory remedy under the provision of the Privacy Act that Plaintiff claims Federal Defendants violated.  And exclusive jurisdiction for a breach of contract claim valued over $10,000 against the federal government—like Plaintiff's— lies with the Court of

Federal Claims. That leaves only one of Plaintiff's claims as even nominally eligible for injunctive relief. However, as detailed below, Plaintiff fails to make a clear showing on *any* of the four factors required for her to gain injunctive relief on her constitutional claim. As such, Plaintiff's motion for a temporary restraining order should be denied in its entirety.

## I.    Plaintiff is Not Entitled to Injunctive Relief on Her Privacy Act Claim (Count 3).

Plaintiff's Privacy Act claim is brought under 5 U.S.C. § 552a(b), which prohibits federal agencies from disclosing records relating to individuals except in specified contexts. Compl. ¶¶ 47–49. And to be sure, the Privacy Act provides a *cause of action* for a violation of this provision. *See* 5 U.S.C. § 552a(g)(1)(D) (allowing an individual to "bring a civil action against the agency" if it "fails to comply with any other provision" of the Act). But important here, the Privacy Act provides for injunctive relief in *only* two narrow circumstances: (1) to order an agency to amend inaccurate, incomplete, irrelevant, or untimely records; and (2) to order an agency to allow an individual access to her records. 5 U.S.C. § 552a(g)(1)(A), (g)(2)(A); *see id.* § 552a(g)(1)(B), (g)(3)(A); *see also Doe v. Chao*, 435 F.3d 492, 504 (4th Cir. 2006) ("[S]ubsection (g)(1)(D) of the Privacy Act does not allow courts to grant injunctive or declaratory relief."). Where, as here, "[a] 'statute provides certain types of equitable relief but not others, it is not proper to imply a broad right to injunctive relief.'" *Parks v. IRS*, 618 F.2d 677, 84 (10th Cir. 1980) (citation omitted). Accordingly, injunctive relief is not available for any other type of Privacy Act claim—including the one Plaintiff brings here based on the CIA's alleged disclosure of Plaintiff's employment information. 5 U.S.C. § 552a(g)(1)(4) (providing relief in form of damages for suits brought under § 552a(g)(1)(D)); *see Sussman v. U.S. Marshal Serv.*, 494 F.3d 1106, 1122 (D.C. Cir. 2007) ("We have held that only monetary damages, not declaratory or injunctive relief, are available to § 552a(g)(1)(D) plaintiffs.") (citing *Doe v. Stephens*, 851 F.2d 1457, 1463 (D.C. Cir. 1988)): *Am.*

*Federation of Teachers v. Bessent*, --- F. Supp. 3d ----, 2025 WL 582063 (D. Md. Feb. 24, 2025) ("The Privacy Act provides a cause of action for damages when an agency improperly discloses records; it does not provide a cause of action for injunctive relief in these circumstances.").

Thus, while Plaintiff claims in her motion that she has established a "*prima facie* violation of the Privacy Act,"[8] she articulates no authority that allows her to obtain any type of injunctive relief, much less emergency injunctive relief. Accordingly, the Court should dismiss her request for a temporary restraining order as she is entitled only to damages under the claim, assuming she can prevail on the merits.

## II.    This Court Lacks Jurisdiction Over Plaintiff's Breach of Contract Claim (Count 2).

Plaintiff cannot obtain *any* relief at this stage on her breach of contract claim, for the simple reason that this Court lacks jurisdiction over it. The Tucker Act waives sovereign immunity for non-tort damage claims against the United States founded, *inter alia*, on "any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). While a district court may exercise jurisdiction over claims not exceeding $10,000, *see* 28 U.S.C. §1346(a)(2) (known as "the Little Tucker Act"), binding authority has made clear that the Court of Federal Claims has **exclusive** jurisdiction for claims above this dollar threshold, *see* 28 U.S.C. § 1491 (known as "the Big Tucker Act"); *Randall v. United States*, 95 F.3d 339, 346 (4th Cir. 1996); *see also Jan's Helicopter Serv.,*

---

[8] In any event, Federal Defendants disagree with this contention. Plaintiff has not made a clear showing—the standard she must meet at this stage to the "extraordinary" emergency relief she now seeks—that the CIA was responsible for any alleged leaks of Plaintiff's employment information based on the record before the Court. *See, e.g.*, *infra* Part III.A.ii. In any event, Plaintiff has clearly slept on her rights in this instance, as she alleges violations of the Privacy Act dating back to December 2024, *see* Compl. ¶ 29, and alleges no instances of potential *future* irreparable harm, which is what any injunctive relief would provide and what the standard demands.

*Inc. v. F.A.A.*, 525 F.3d 1299, 1304 (Fed. Cir. 2008); *Scarlett v. Nat'l Science Foundation*, 2024 WL 3732447, at *3 (E.D. Va. Aug. 6, 2024) (Nachmanoff, J.).

As Plaintiff's claim is for at *least* $75,000,[9] exclusive jurisdiction lies in the Court of Federal Claims under the Big Tucker Act. *Jan's Helicopter*, 525 F.3d at 1304; *E. Enters. v. Apfel*, 524 U.S. 498, 520 (1998) ("[T]he Court of Federal Claims has exclusive jurisdiction to render judgment upon any claim against the United States for money damages exceeding $10,000."); *see Meridian Invs., Inc. v. Fed. Home Loan Mortg. Corp.*, 855 F.3d 573, 578 (4th Cir. 2017) (recognizing that jurisdiction over claims in excess of $10,000 lies exclusively with the Court of Federal Claims). Even though Plaintiff seeks injunctive relief, which the Court of Claims cannot grant, that "is no grounds for denying its jurisdiction over the claim" because "the remedy for breach of a contractual obligation is damages, which the Court of Claims is fully capable of assessing." *Am. Sci. & Eng'g, Inc. v. Califano*, 571 F.2d 58, 62 (1st Cir. 1978); *see also Ginsberg v. United States*, 707 F.2d 91, 93–94 (4th Cir. 1983) (citing *Califano*). Plaintiff raises no legal grounds in her motion to suggest that this Court has jurisdiction.

Given its lack of jurisdiction, Federal Defendants ask that the Court deny Plaintiff's motion for injunctive relief at this stage, leaving open the question of whether Plaintiff's breach of contract claim should be properly dismissed or transferred to the Court of Federal Claims until it can be fully addressed at the proper procedural stage (i.e., upon a motion to dismiss).[10]

---

[9] While Plaintiff seeks over $75,000 in compensatory damages in her Complaint, it is not entirely clear what amount of that, if any, is attributed to her breach of contract claim. Assuming however, that Plaintiff seeks loss of income and full retirement benefits (which she suggests that she will, *see* Pl.'s Mot. at 22), it is extremely unlikely that Plaintiff's claim is *less than* $10,000. *See* 28 U.S.C. § 1346(a)(2) (district courts may exercise jurisdiction over contract claims against the United States only where claim does not exceed $10,000).

[10] Should this Court wish to adjudicate this threshold question in the current emergency context, the Federal Defendants believe that Plaintiff's breach of contract claim should be dismissed outright (as opposed to being transferred to the Court of Federal Claims), as it is unclear whether

III.    **Plaintiff Has Not Met the High Burden Required for the Extraordinary Remedy of Injunctive Relief on Her Constitutional Claim.**

The only claim Plaintiff has that is *arguably* eligible for injunctive relief is her constitutional due process claim. However, a careful review of the record facts and the law shows that Plaintiff's claim is nothing more than a run-of-the-mill employment contract claim—for which she can obtain full remedy through monetary damages. As explained in depth below—and outlined by undersigned counsel during the May 5, 2025 hearing, Plaintiff has not, and cannot, clearly show that she is entitled to the extraordinary remedy of injunctive relief here. Accordingly, her motion must be denied.

A.    **Plaintiff Cannot Establish that She is *Clearly* Likely to Succeed on the Merits.**

Plaintiff's claim falters at the start as she is unlikely to succeed on the merits of her constitutional due process claim for both factual and legal reasons. First—as a matter of law—Plaintiff has not stated a cognizable constitutional claim. Second, even assuming Plaintiff had articulated a viable legal theory—which she has not, her factual showing at this stage is not sufficient to entitle her to the "extraordinary" emergency injunctive relief she seeks at this threshold stage. To the contrary, the record now available to the Court establishes that Plaintiff's conspiracy theory as to why she was terminated from her position at the CIA is wrong.

i.    ***Plaintiff Has No Cognizable Constitutional Claim.***

Because Plaintiff's so-called constitutional claim against Federal Defendants is really a simple contract claim, she struggles to find a legal theory that will entitle her to relief, and thus seeks to dress that simple contract claim in "constitutional garb," which runs afoul of limitations of the Due Process Clause. *See Shirvinski v. U.S. Coast Guard*, 673 F.3d 308, 314 (4th Cir. 2012).

---

Plaintiff would wish to litigate that claim in that alternative forum. Dismissal without prejudice would allow Plaintiff to make that litigative decision.

*Cf. Bannum, Inc. v. City of Fort Lauderdale*, 657 F. Supp. 735, 738 (S.D. Fla. 1986) (rejecting request for preliminary injunction because, in part, "Plaintiffs' claim is in truth based on an interference with contract theory, conveniently disguised in constitutional garb"). As explained below, Plaintiff does not succeed on any of her legal theories.

**The Accardi Doctrine.**   First, despite conceding that "she maintains no cognizable property interest in her contract position" with CIA and that she was fired under her employment contract's express term that she could be fired "for any reason," Plaintiff claims she "she maintains a cognizable interest in the Agency following its own rules regarding termination. Pl.'s Mot. at 5. There are two problems with this theory.

*First,* Plaintiff cites no authority for the proposition that an agency's failure to follow its own regulations is *per se* a constitutional issue. What Plaintiff refers to—albeit obliquely—is the *Accardi* doctrine, named after the seminal Supreme Court case on the issue. *See United States ex rel. Accardi v. Shuaughnessy*, 347 U.S. 260, 504 (1954). But it is far from clear that the *Accardi* doctrine, although generally referencing "due process," is a doctrine of *constitutional law* that invokes the Fifth Amendment. *See Bourdon v. DHS*, 983 F.3d 473, 483 (11th Cir. 2020). And in fact,  the Supreme Court has stated that *Accardi* "enunciate[d] principles of federal administrative law, other than of constitutional law binding on the States." *Bd. of Curators v. Horowitz*, 435 U.S. 78, 92 n.8 (1978); *see also CGB v. Wolf*, 464 F. Supp. 3d 174, 226 n.41 (D.D.C. 2020).

This Court, however, does not need to wade into these doctrinal waters, because Plaintiff, does not describe how the CIA failed to follow its own rules regarding termination. The CIA's own regulations governing the termination of contract employees such as Plaintiff state that the terms of the contract apply—and that Plaintiff has no right to appeal the decision. *See* Ex. 4 at §§ C.1, E.1. The *Accardi* doctrine has traditionally been applied in instances involving "an agency's

failure to afford an individual *procedural* safeguards required under its own regulations." *United States v. Morgan*, 193 F.3d 252, 266 (4th Cir. 1999) (emphasis added).  Courts have held that claims under the *Accardi* doctrine provide relief where there are discrete failures by an agency to abide by its own rules or regulations that aim to protect procedural protections.  *See id.* (collecting cases).  In the present case, Plaintiff identifies no procedural safeguards that the agency was required to provide by its own regulations.  Nor does Plaintiff provide authority suggesting that applying the *Accardi* doctrine in these circumstances is appropriate.

     ***Terminated for "Unlawful" Reasons.***  Plaintiff next asserts that the CIA terminated her employment contract because of *Mr. Raiklin's* alleged defamation against her.  As a threshold matter, Plaintiff's assertions are entirely uncorroborated.  Although the Complaint contends that the agency "note[d]" the alleged defamation as the reason for her firing, Compl. ¶ 43, the CIA made no such reference or adoption of such statements in relation to Plaintiff's termination.  The termination provision of the contract allows either party to terminate the contract "for any reason" and does not require Plaintiff or the agency to provide any basis.  In accordance with the contract, the CIA did not provide a reason, much less make any reference to any alleged statements.  Indeed, Plaintiff acknowledges that no reason was articulated for her termination.  *See id.* ¶ 35.

     In any event,  Plaintiff provides no legal support for the proposition that it is unlawful for an employer to rely on what Plaintiff believes to be false statements to fire someone, let alone that doing so constitutes a constitutional due process violation.  Accepting Plaintiff's theory allows *any* public employee to invoke the Due Process Clause any time that they disagree with the factual rationale for their termination—no matter what it is.   Simply put, even assuming Plaintiff's allegations were true—which they are not—and Plaintiff *was* terminated by the CIA because Mr. Raiklin asked Ms. Loomer to ask Mr. Trump to do so and gave defamatory reasons for the

termination—which is not true—Plaintiff would ***still not have a constitutional claim for relief.***
That holds true even if, as Plaintiff alleges, the CIA ***knew*** that Mr. Raiklin's statements about
Plaintiff were false and ***still*** fired her on that basis. Undersigned counsel is not aware of any case
law to the contrary. But even if such authority existed, Plaintiff still has, at most, a breach of
contract claim. There is nothing to suggest that the due process clause is implicated simply because
an employee is terminated for false (but not discriminatory) reasons.

    ***"Stigma-Plus" Deprivation of Liberty Interest.*** Plaintiff's third theory is that she suffered
a due process violation because the CIA terminated her and defamed her in the process by leaking
to Breitbart News that she was fired for alleged activity in connection with her role at the DoD
with respect to COVID-19 vaccinations for servicemembers.

    The Fourth Circuit recognizes a due process claim based on the deprivation of a liberty
interest where a public employer makes "stigmatizing remarks" "in the course of a discharge or
significant demotion." *Ridpath v. Bd. of Governors*, 447 F.3d 292, 309 (4th Cir. 2006) (quotation
omitted).[11] This type of claim—referred to as "stigma plus"—"'prevent[s] a public employer from
disseminating false reasons for the employee's discharge without providing the employee notice
and [an] opportunity to be heard in order to clear [her] name.'" *Hamilton v. Mayor & City Council
of Baltimore*, 807 F. Supp. 2d 331, 356 (D. Md. 2011) (quoting *Miller v. Hamm*, 2011 WL 9185,
at *8 (D. Md. Jan. 3, 2011)).

---

[11] The Fourth Circuit describes this type of due process claim as arising from "two distinct rights
protected by the Fourteenth Amendment," namely the right "to engage in any of the common
occupations of life," and the "the right to due process '[w]here a person's good name, reputation,
honor, or integrity is at stake because of what the government is doing to him." *Sciolino v. City of
Newport News, Va.*, 480 F.3d 642, 646 (4th Cir. 2007) (internal quotations and citations omitted).
Accordingly, "a Fourteenth Amendment 'liberty interest is implicated by public announcement of
reasons for an employee's discharge.'" *Id.* at 645–46 (quoting *Johnson v. Morris*, 903 F.2d 996,
999 (4th Cir. 1990)).

To state a stigma plus claim, Plaintiff must allege that the charges against her: (1) placed a stigma on his reputation; (2) were made public by the employer; (3) were made in conjunction with his termination or demotion; and (4) were false." *Sciolino v. City of Newport News, Va.*, 480 F.3d 642, 646 (4th Cir. 2007). And importantly here, "[s]tigma-plus claims are generally premised on an ***overt, direct government statement*** that the plaintiff has a serious character flaw." *Moschetti v. Office of the Inspector General*, 2022 WL 3329926, at *6 (E.D. Va. Aug. 11, 2022) (emphasis added). This is illustrated by the cases where the Fourth Circuit has provided "concrete examples of the types of public statements" that can create a stigma-plus claim. *Ridpath*, 447 F.3d at 447 F.3d 292; *see Boston v. Webb,* 783 F.2d 1163, 1165–66 (4th Cir. 1986) (press release issued by City Manager that plaintiff, a city police officer, was discharged after failing to disprove allegation of receiving bribe); *Cox v. N. Va. Transp. Comm'n,* 551 F.2d 555, 557–58 (4th Cir. 1976) (public statements by state board commissioners to newspapers attributing plaintiff's discharge to investigation of financial irregularities); *McNeill v. Butz,* 480 F.2d 314, 319–20 (4th Cir. 1973) (state department of agriculture charged government employees with violating various regulations, such as fraudulently obtaining federal payments for farm operators, in connection with discharges).

Plaintiff's entire argument on this score is premised on an ambiguously worded phrase in an April 8, 2025 Breitbart News article, namely that: "Terry Adirim, a senior CIA official and former senior defense official ***who played a pivotal and potentially illegal role in the Biden Administration's military vaccine mandate***, was recently fired from the agency, a source has exclusively revealed to Breitbart News."[12] Ex. 5 at 1.

---

[12] In her motion, Plaintiff also refers to other defamation by Mr. Raiklin—including that he allegedly accused Plaintiff of "treason, genocide, war crimes, homicide and mutilation." Pl.'s Mot. at 1. However, none of this language (or anything like it) appears in the Breitbart News article, let alone is attributed to Breitbart News' source—and it certainly is not attributed to the CIA. Nor does the Breitbart News article mention Mr. Raiklin. *See* Ex. 5. Plaintiff therefore cannot use Mr.

Under *any* standard, this is not a direct, clear statement from the CIA regarding the reason for Plaintiff's termination. As an initial matter, Breitbart News does not identify its source. But moreover, the wording of the sentence, which uses the phrase "potentially illegal role" as an identifier, does not appear to actually come from the source. Rather, a reasonable person reading the sentence is more likely to come away with the impression that Breitbart News—not the source—is opining that Plaintiff played a "potentially illegal role in the Biden Administration's military vaccine mandate." This impression is further underscored by reading the remainder of the article, which in fact, is largely Breitbart News's **own analysis** of whether Plaintiff's activity with respect to the DoD vaccine mandate was legal. *See* Ex. 5 at 1–4. Breitbart News had in fact, published a similar article calling into question the legality of Plaintiff's activity at the DoD over **two years** before. *See* Ex. 3 at 3–6. At the very least, Plaintiff has not made the type of *clear* showing that she is likely to succeed on the merits that is required to receive extraordinary emergency relief.

At the May 5, 2025 hearing however, Plaintiff's counsel indicated it was not the Breitbart News article itself, but Donald Trump Jr.'s "*tweet*" of the article's headline that constituted a public government statement for purposes of her stigma-plus claim. But this makes Plaintiff's claim that the CIA publicly stated she was fired for potentially illegal activity even more absurd. Donald Trump Jr. is not employed by *any branch* of the federal government, let alone the CIA. Plaintiff does not allege otherwise. But even if he were, the tweet does not actually link to the Breitbart News article, meaning he does not actually reproduce the alleged defamation at issue—the words "potentially illegal" do not appear in the Breitbart News headline *or* Donald Trump Jr.'s tweet.

---

Raiklin's alleged defamatory statements against her as the basis for claiming that the CIA (or any other government actor) made stigmatizing remarks about her in connection with her termination.

*See* Dkt. 1-6; Exs. 5 & 10.  Nor is Donald Trump Jr.'s an unequivocal endorsement or statement regarding Plaintiff's termination.  At most, he is expressing a positive emotion that Plaintiff was terminated from the CIA.  His tweet of "[b]ye bye" followed by a hand-waving emoji is ***hardly*** an overt statement directly attributable to the government that affirms Plaintiff was terminated due to potentially illegal activity.

Accordingly, even as pled, Plaintiff has no viable due process claim for which she can be awarded any relief, let alone injunctive relief.  She therefore cannot succeed on the merits of her constitutional claim as a matter of law.

### ii.  *Plaintiff's Termination Was Not Related to the Alleged Events in Her Complaint.*

Even assuming Plaintiff has a cognizable constitutional claim at stake (which she does not), she will not be able to prevail because her underlying factual theory—that the CIA fired her because Ivan Raiklin told Laura Loomer to ask President Trump to do—is wrong.

As explained by the declaration of Brenda McKinlay, Deputy Chief Operating Officer at the CIA, the CIA's decision to terminate Plaintiff's contract had nothing to do with Laura Loomer, Ivan Raiklin, or Plaintiff's role at DOD relating to COVID vaccines.   Ex. 1 ¶ 7.  The CIA began reviewing issues concerning Plaintiff by approximately mid-March 2025, weeks before the alleged April 2, 2025 White House meeting between President Trump and Ms. Loomer.  *Id.* ¶ 5.  The CIA's review was not related to or the result of Ms. Loomer, Mr. Raiklin, or COVID vaccines.  *Id.*

What CIA found was that Plaintiff's conduct had already generated multiple complaints by several different CIA officers regarding alleged inappropriate and harassing statements and actions by Plaintiff towards them in the workplace.  *Id.* ¶ 6.  Moreover, these issues had first arisen almost immediately after Plaintiff began working at the CIA and additional allegations continued to accumulate throughout.  *Id.*   By mid-March 2025, a range of concerns relating to Plaintiff came

to the attention of CIA's senior-most leadership.  *Id.* The result of CIA's review of concerns regarding Plaintiff—only months into her new position—led CIA to exercise the termination provision of her contract.  *Id.* ¶¶ 6–7.  CIA's decision was not related Laura Loomer, Ivan Raiklin, or Plaintiff's prior role with respect to DOD's COVID vaccine policy.  *Id.* ¶ 7.  Because the CIA did *not* decide to terminate Plaintiff because of her role at the DoD in COVID vaccinations, it is implausible that the agency supplied that as the reason for her termination to Breitbart News (or its "source").

Even *without* the facts supplied by the agency's declaration, Plaintiff does not make an adequate showing of a clear likelihood of success.  Plaintiff's allegations have little to no support other than her say-so and are, at best, far-reaching speculation.  There is no reason other than the close timing of Ms. Loomer's White House visit and the CIA's communication of its termination decision to Plaintiff to suggest the two are linked.  Ms. Loomer has not publicly taken credit for Plaintiff's termination.[13]  Her visit to the White House was reportedly about officials at the National Security Agency and on the National Security Council—not CIA employees.  Plaintiff supplies no support for her contention that Ms. Loomer and Mr. Raiklin are "close associates" other than a single tweet by Mr. Raiklin about Ms. Loomer and the fact that they both appeared at same event one a single occasion two years ago.  In short, it seems incredibly unlikely that Plaintiff will be able to establish that she was terminated because of some chain of events that began with Mr. Raiklin and ended with President Trump.

---

[13] In contrast, Ms. Loomer has very publicly taken credit for the terminations of other federal employees, which Plaintiff makes note of in her Complaint.  Compl. ¶ 4; Dkt. 1-3

But *given* the underlying facts supplied by the CIA's declaration, Plaintiff certainly cannot demonstrate any likelihood of success on the merits of her claim. She certainly has not made the requisite **clear** showing at this point in time.

### B. Plaintiff Has No Irreparable Harm at Stake in this Run-of-the-Mill Employment Contract Dispute.

In addition to failing to make a clear showing on the merits of her case, Plaintiff does not demonstrate the type of irreparable harm that is required for a temporary restraining order. This is for two reasons.

*First*, the Supreme Court itself has explained that "a party requesting a preliminary injunction must generally show reasonable diligence" in protecting her interests. *Benisek v. Lamone*, 585 U.S. 155, 159 (2018); *see also Quince Orchard Valley Citizens Ass'n v. Hodel*, 872 F.2d 75, 80 (4th Cir. 1989) (holding that because "an application for a preliminary injunction is based upon an urgent need for the protection of [a] plaintiff's rights, a long delay in seeking relief indicates that speedy action is not required" (quoting *Skehan v. Bd. of Trustees*, 353 F. Supp. 542, 543 (M.D. Pa. 1973)). When a plaintiff "could have sought a preliminary injunction" much earlier than it did, *Benisek*, 585 U.S. at 160, he cannot take advantage of an "emergency . . . of [his] own making" to obtain extraordinary injunctive relief, *Respect Maine PAC v. McKee*, 622 F.3d 13, 16 (1st Cir. 2010), especially when it forces the government to litigate complex statutory questions unnecessarily on an artificially compressed schedule, *see Mintz v. Chivmento*, 724 F. Supp. 3d 40, 50 (N.D.N.Y. 2024). Here, plaintiff learned that her contract would be terminated *thirty days* ago, but elected to file a complaint and a request for a temporary restraining order *one day* before the actual termination date.

*Second*, as the Fourth Circuit has recognized, the Supreme Court's decision in *Sampson v.*

*Murray*, 415 U.S. 61 (1974) created a "higher requirement of irreparable injury" for government employees seeking a temporary injunction of their pending termination. *Guerra v. Scruggs*, 942 F.2d 270, 274 (1991). In *Sampson*, the Supreme Court held that a showing of injuries such as loss of income and damage to reputation "falls far short of the type of irreparable injury which is a necessary predicate to the issuance of a temporary injunction in this type of case." 415 U.S.at 92. As the Supreme Court reasoned, "[t]he possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Id.* at 90. Nevertheless, the Supreme Court was reluctant to foreclose the possibly of injunctive relief "in the genuinely extraordinary situation." *Id.* at 92 n. 68. It therefore noted in a footnote that "cases may arise in which the circumstances surrounding an employee's discharge, together with the resultant effect on the employee, may so far depart from the normal situation that irreparable injury might be found." *Id.*

Here, Plaintiff's claimed irreparable harms are of exactly the sort discussed in *Sampson*— namely damage to her reputation and loss of income. Plaintiff relies on a single case, *Roe v. Department of Defense*, 947 F.3d 207 (4th Cir. 2020), to suggest otherwise. She argues that Donald Trump Jr.'s tweet and Breitbart News' article "clearly damage Plaintiff's ability to obtain private sector work going forward, similar to the situation of the airmen in *Roe*." Pl.'s Mot. at 6. But the *Roe* case bears little similarity to Plaintiff's. In *Roe*, the Fourth Circuit upheld injunctive relief for HIV-positive servicemembers who were set to be discharged solely on the basis of their HIV status.[14] 947 F.3d at 229. In doing so, the Fourth Circuit affirmed the district court's determination

---

[14] Further underscoring why *Roe* makes a poor comparator, there was no dispute amongst the parties in *Roe* as to *why* the servicemembers were being discharged. To the contrary, the reasoning was set forth by numerous review boards as well as military policy. *See Roe*, 947 F.3d at 214–218. Here, Federal Defendants contest the underlying factual allegations of Plaintiff's claims.

that there two "two circumstances"—as hypothesized by the Supreme Court in *Sampson*—surrounding the servicemen's discharge that "would create irreparable harm." *Id.* These circumstances were: (1) "'a particularly heinous brand of discharge' based on 'outmoded policies related to' HIV that 'bears no relationship to their 'ability to perform [their] job[s]'"; and (2) that the servicemembers would "likely be forced to reveal" their HIV status if discharged on that basis, which could compound their injuries given "the stigma facing those living with HIV." *Id.* (quotation omitted).

No such circumstances are at play here. Notably, Plaintiff was terminated by the agency through the exercise of the clear terms of Plaintiff's at-will employment contract, and for reasons, as explained above, that were unrelated to the defamation she complains of by Mr. Raiklin. There is no reason why Plaintiff must disclose the Breitbart News article or Donald Trump Jr.'s tweet about her in order to obtain future employment. Nor does it logically follow that if Plaintiff were to do so, it would necessarily reflect badly on her in *all* corners of the private sector. Indeed, much of what Plaintiff terms "defamation" appears to be more akin to political hyperbole and/or opinion, which most individuals are unlikely to take as serious, factual accusations of criminal activity. As such, there is no reason here for the Court to invoke the extraordinary relief of an injunction in what is, by and large, a routine employment case,

## C.     The Balance of Equities and Public Interest Favor the Government.

The final requirements for obtaining a temporary restraining order require a plaintiff to demonstrate that the balance of equities tips in his or her favor, and that a preliminary injunction is in the public interest. *Winter*, 555 U.S. at 20, 22; *Dewhurst v. Century Aluminum Co*., 649 F. 3d 287, 290 (4th Cir. 2011). These factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Plaintiff claims that these factors favor her because her

"lengthy and honorable public service record speaks for itself" and in contrast, the Federal Defendants are merely "acting as partisan catspaws for irrational conspiracy theorists outside of the Government, by terminating Plaintiff on the basis of false and defamatory accusations against her." Pl.'s Mot. at 7. The agency's declaration—attesting to the *actual* reasons Plaintiff was terminated—put this theory firmly to bed. To elevate Plaintiff's speculation above the CIA's *declared* rationale for its own decision-making would strip the agency of its ability to make its own independent decisions about the best personnel suited to serve in sensitive and high-level roles in our federal government. Plaintiff acts as the proverbial employment plaintiff, asking the Court to favor her own evaluation of herself over that of her employer. The public interest is not best served by individual actors determining when and how they have the right to enter and leave government employment. Accordingly, these factors strongly favor the CIA.

\*    \*    \*

In sum, Plaintiff makes no clear showing that her termination must be stayed at the outset rather than follow the normal and prescribed path of other litigants. While she claims she will suffer constitutional injuries that cannot be remedied later on, Plaintiff's claim is nothing more than a classic contract dispute about the termination of her employment. As such, she can gain access to a full panoply of remedies that will make her whole should she ultimately prevail on her claim. There is no pressing reason to grant her injunctive relief at the outset.

## CONCLUSION

For the foregoing reasons, Federal Defendants respectfully request that this Court deny Plaintiff's motion for a temporary restraining order.

Dated: May 6, 2025

Respectfully submitted,

ERIK S. SIEBERT
UNITED STATES ATTORNEY

By:  _____/s/_____
CAROLYN M. WESNOUSKY
Assistant United States Attorney
Office of the United States Attorney
Justin W. Williams U.S. Attorney's Building
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel: (703) 299-3996
Fax: (703) 299 3983
Email: carolyn.wesnousky@usdoj.gov

*Counsel for Federal Defendants Central Intelligence Agency and Director John Ratcliffe*