# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

TERRY ADIRIM, M.D.,

      Plaintiff,

      v.

U.S. CENTRAL INTELLIGENCE
AGENCY, et al.

      Defendants.

Case No. 25-768

### DECLARATION OF BRENDA McKINLAY, DEPUTY CHIEF OPERATING OFFICER, CENTRAL INTELLIGENCE AGENCY

I, Brenda McKinlay, hereby declare as follows:

1.    I currently serve as Deputy Chief Operating Officer ("D/COO") at the Central Intelligence Agency ("CIA" or "Agency"), a position I have held since May 2022.  At CIA, the Chief Operating Officer ("COO") is the third-ranking management official at the Agency, responsible for assisting the Director of the CIA ("DCIA") and the Deputy Director of the CIA ("DD/CIA") in the daily management of the Agency, strategic planning and coordination, and the development of the Agency's annual program budget.  As the D/COO, I am the fourth-ranking management official at the CIA; I assist the COO in carrying out the COO's responsibilities, and I am delegated all authorities vested in the COO other than those reserved by law or policy.

2.    Prior to serving in this role, I had served as the Agency's Chief Financial Officer ("CFO") since 2014. As CFO, I had broad responsibility for CIA's resource decision-making across the spectrum of Agency functions and helped the DCIA and DD/CIA develop and implement strategic priorities for the Agency. I began my Agency career as a Student Trainee in 1995, and converted to full-time staff in 1997 to serve in various roles in the Directorate of Science and Technology and at the National Reconnaissance Office. From 2006 until 2012, I was a program and resource analyst for the Office of the Director of National Intelligence ("ODNI"). In that role, I was responsible for oversight of the CIA Program within ODNI's Office of the Chief Financial Officer. I returned to CIA in 2012 to serve as CIA's Deputy Comptroller and became Comptroller in 2013.

3.    Through the exercise of my official duties, I have become familiar with the claims asserted by Plaintiff Terry Adirim ("Dr. Adirim") against the defendants in this matter, including those against the CIA and DCIA John L. Ratcliffe in his official capacity. I make the following statements based upon my personal knowledge and information made available to me in my official capacity, including by other CIA officials with direct involvement in the events.

4.    Dr. Adirim began working at the CIA by signing a contract for the performance of services with the CIA on 16

2

December 2024.  The contract contains a termination provision that permitted either party to terminate the contract, for any reason, upon 30 days' notice.  The contract did not require either CIA or Dr. Adirim to provide any reason(s) for the termination.

5.    The CIA began reviewing issues concerning Dr. Adirim well before the alleged 2 April 2025 White House meeting with Laura Loomer.  See Compl. ¶ 32.  These issues were not related to Laura Loomer, her subsequent White House visit, public statements by Loomer or Defendant Ivan Raiklin, or Dr. Adirim's prior role with respect to DOD's COVID vaccine policy.

6.    I understand that, by March 2025, Dr. Adirim had already become the subject of a number of concerns at the Agency.  For example, Dr. Adirim's conduct had already generated multiple complaints by several different CIA officers regarding alleged inappropriate and harassing statements and actions by Dr. Adirim towards them in the workplace.  These issues first arose almost immediately after the start of Dr. Adirim's tenure at CIA and continued to accumulate throughout.  I first became aware of such concerning allegations in February 2025.  A range of concerns relating to Dr. Adirim came to the attention of CIA's senior-most leadership by mid-March 2025.

7.    The result of CIA's review of concerns regarding Dr. Adirim led the Agency to exercise the termination provision of

3

her contract.   This decision was not related to Laura Loomer, her White House visit, public statements by Loomer or Raiklin, or Dr. Adirim's prior role with respect to DOD's COVID vaccine policy.

8.    Consistent with the agreed-upon termination provision of the contract, CIA notified Dr. Adirim on 4 April 2025 that it was terminating the contract and placed Dr. Adirim on administrative leave for 30 days effective 4 April.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed this _6th_ day of May 2025

Brenda McKinlay
Deputy Chief Operating Officer
Central Intelligence Agency

# Exhibit 2

## ASSISTANT SECRETARY OF DEFENSE

**1200 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-1200**

**HEALTH AFFAIRS**

MEMORANDUM FOR ASSISTANT SECRETARY OF THE ARMY (MANPOWER AND
      RESERVE AFFAIRS
      ASSISTANT SECRETARY OF THE NAVY (MANPOWER AND
      RESERVE AFFAIRS
      ASSISTANT SECRETARY OF THE AIR FORCE (MANPOWER
      AND RESERVE AFFAIRS
      DIRECTOR, DEFENSE HEALTH AGENCY

SUBJECT: Mandatory Vaccination of Service Members using the Pfizer-BioNTech COVID-19
      and Comirnaty COVID-19 Vaccines

On August 23, 2021, the U.S. Food and Drug Administration (FDA) approved the
biologics license application for the Comirnaty vaccine, made by Pfizer-BioNTech, as a two-
dose series for prevention of coronavirus disease 2019 (COVID-19) in persons aged 16 years or
older. Previously, on December 11, 2020, the FDA issued an Emergency Use Authorization
(EUA) for the Pfizer-BioNTech COVID-19 vaccine, which has the same formulation as the
Comirnaty vaccine. Per FDA guidance, these two vaccines are "interchangeable" and DoD
health care providers should "use doses distributed under the EUA to administer the vaccination
series as if the doses were the licensed vaccine."[1]

Consistent with FDA guidance, DoD health care providers will use both the Pfizer-
BioNTech COVID-19 vaccine and the Comirnaty COVID-19 vaccine interchangeably for the
purpose of vaccinating Service members in accordance with Secretary of Defense Memorandum,
"Mandatory Coronavirus Disease 2019 Vaccination of Department of Defense Service
Members," August 24, 2021.

My point of contact for this guidance is Colonel Michael J. Berecz, who may be reached
at (703) 681-8463 or michael.j.berecz.mil@mail.mil.

ADIRIM.TERR Digitally signed by
Y.A.152384712 ADIRIM.TERRY.A.152384
7127
7 Date: 2021.09.14 11:02:05
-04'00'

Terry Adirim, M.D., M.P.H., M.B.A.
Acting

cc:
Surgeon General of the Army
Surgeon General of the Navy
Surgeon General of the Air Force
Joint Staff Surgeon

---

[1] FDA, "Q&A for Comirnaty (COVID-19 Vaccine mRNA)," https://www.fda.gov/vaccines-blood-biologics/qa-comirnaty-covid-19-vaccine-mrna, accessed September 10, 2021.

# Exhibit 3

# BREITBART

## EXCLUSIVE: DOD WOULDN'T LET TROOPS WAIT FOR FDA-APPROVED VACCINE



Jon Cherry/Getty Images

*by* KRISTINA WONG | 27 Sep 2022

The Pentagon considered as far back as October 2021 offering service members the option of taking the FDA-approved vaccine versus the vaccine authorized for emergency use before facing any punishment, but ultimately decided against it, paving the way for thousands to be discharged from the military, according to documents obtained by Breitbart News.

A senior defense official proposed in an October 20, 2021 action memo allowing service members who did not want to take the vaccine that was under Emergency Use Authorization (EUA) — known as the PfizerBioNTech COVID-19 vaccine — to wait instead for the FDA-approved vaccine — known as Comirnaty — before facing punishment for being unvaccinated.

The action memo, digitally signed by Deputy Assistant Secretary of Defense for Health Readiness Policy and Oversight David J. Smith, proposed in a draft memo the following change:

If a Service member, after medical counseling, declines administration of the EUA-manufactured product, DoD health care providers should engage with their logistics chain to secure and administer the [Biologics License Application]-manufactured Pfizer-BioNTech/Comirnaty product prior to any

> punitive action being taken against the Service member.

The draft memo was proposed as a replacement for one signed by then-acting Assistant Secretary of Defense for Health Affairs Terry Adirim on September 14, 2021, which said the two vaccines were "interchangeable" and should be treated as such by the Department of Defense (DoD).

Adirim's memo stated:

> Per FDA guidance, these two vaccines are 'interchangeable' and DoD health care providers should 'use doses distributed under the EUA to administer the vaccination series as if the doses were the licensed vaccine.'1
>
> Consistent with FDA guidance, DoD health care providers will use both the PfizerBioNTech COVID-19 vaccine and the Comirnaty COVID-19 vaccine interchangeably for the purpose of vaccinating Service members in accordance with Secretary of Defense Memorandum, 'Mandatory Coronavirus Disease 2019 Vaccination of Department of Defense Service Members,' August 24, 2021.

Smith's action memo was addressed to Adirim, with a recommendation for her to sign the draft memo with the proposed change.

Under 10 U.S.C. Section 1107(a), a defense secretary can order service members to take an FDA-approved vaccine, but he cannot legally order service members to take an EUA-manufactured vaccine without seeking and obtaining a waiver from the president.

Under 10 U.S.C. Section 1107(a), that waiver must be signed by the president then the defense secretary must formally notify Congress of the waiver. Congress has never received notification of such a waiver.

According to the documents obtained by Breitbart News, a senior Air Force official responding to the proposed change argued that adopting the change could open the military up for more litigation and force it to possibly reverse punishments already given.

The Air Force's acting assistant secretary of manpower and reserve affairs wrote in a response on October 29, 2021, to the draft memo (which had been sent to the military services for coordination):

However, the proposal was never adopted, with legal implications for the DoD.

**distinction does matter would probably require signifiant remedial actions.**

The Air Force was the first branch to begin kicking out service members, with the first 27 members kicked out by December 2021.

> On behalf of my Component, my formal response to this issuance is: Nonconcur. Below are comments that detail my Component's objections to this issuance.

His response said the proposed change would suggest that DOD considers the EUA-manufactured vaccine different from the FDA-approved Comirnaty product and could open the Air Force up to lawsuits, and that since adverse action had already possibly been taken, "significant remedial actions" would probably be required.

The Air Force's response said (emphasis added):

> **This subverts our current [Department of Air Force] vaccination mandate and may open up the Air Force for increased litigation from individuals who have been mandated since 24 August to be vaccinated.** If there is no difference that can otherwise be communicated, we recommend non-concur with this paragraph as it subverts current policy. We are all operating under the belief that the lot issue is a distinction without a difference from a health/safety/medical/legal perspective. **As the services have taken action, possibly include adverse action, based on a belief that the distinction is one without meaningful difference, [Office of the Secretary of Defense] retrenchment signifying that the**

Today, at least 7,502 service members have been involuntarily discharged from the military for not being fully vaccinated. It is possible that many of those service members would still be serving if they had been given the chance to wait for an FDA-approved vaccine.



*WASHINGTON, DC – NOVEMBER 04: Senator Roger Wicker (R-MS) calls for members of the military who chose to not get the COVID vaccine to not be dishonorably discharged during a news conference in the Russell Senate Office Building on Capitol Hill on November 4, 2021 in Washington, DC. Nearly 87 percent of active duty U.S. military troops have gotten a mandatory coronavirus vaccine ahead of deadline, with those seeking a exemptions being largely dismissed. (Photo by Sarah Silbiger/Getty Images)*

The DoD is now facing several lawsuits from service members over the legal differences between the EUA-only vaccine and the FDA-approved Comirnaty.

Austin had pledged to service members that he would seek a presidential waiver, but it is not clear he ever did so. He said in an August 9, 2021, memo to the military (emphasis added):

> Based on these consultations and on additional discussions with leaders of the White House COVID-19 Task Force, **I want you to know that I will seek the president's approval to make the vaccines mandatory** no later than mid-September, or immediately upon the U.S. Food and Drug Administration licensure, whichever comes first.

Austin had also pledged that his order would only use the FDA-approved vaccine. He wrote in an August 24, 2021, memo that mandated the vaccine: "Mandatory vaccination against COVID-19 will only use COVID-19 vaccines that receive full licensure from the Food and Drug Administration (FDA), in accordance with FDA-approved labeling and guidance."

Then-Pentagon Press Secretary John Kirby even said vaccines other than Comirnaty would not be made mandatory.

Breitbart News on Friday questioned the Pentagon if Austin ever sought a presidential waiver to mandate the EUA-manufactured vaccine. Breitbart News asked the DoD: "Did [Secretary of Defense Lloyd Austin] ever request a presidential waiver for any of the vaccines that the DoD health providers administered to service members from President Biden?"

The Pentagon did not respond to the question directly, but instead said:

> Per FDA guidance, the Pfizer-BioNTech COVID-19 vaccine and the Comirnaty COVID-19 vaccine had the same formulation and the two vaccines were 'interchangeable.' Accordingly, DoD health care providers could 'use doses distributed under the EUA to administer the vaccination series as if the doses were the licensed vaccine.'

military for bad conduct and could affect the person's future job prospects. This is particularly true for young service members with little other professional experience in their backgrounds.

Tens of thousands more have either refused the vaccines or have applied for medical, administrative, or religious exemptions and are still awaiting adjudication of their requests.

Federal court judges have ordered the Navy, Air Force, and Marine Corps to stop taking adverse action against any unvaccinated service members who have applied for religious exemption as they fight the mandate on the basis of violation of their religious freedom, but there is evidence that those service members are still facing consequences, such as having promotions delayed and assignments and travel restricted.

There is not yet a class action lawsuit prohibiting adverse action for members of the Army, though various lawyers are working aggressively to file such lawsuits.

According to Sen. Ron Johnson (R-WI) recently, some military whistleblowers have claimed that vaccine vials at a military base were mislabeled "Comirnaty," despite their lot number appearing on a CDC database listing EUA vaccine lot numbers.

Johnson last month sent a letter to the DoD, FDA, and CDC demanding answers.

"DoD, FDA, and CDC must provide a thorough explanation for why a vaccine lot with the 'Comirnaty' label would be listed on a database that is meant to display vaccine lots associated with the EUA," he wrote.

A spokeswoman for Johnson said the senator has not heard back from the agencies yet.

***Follow Breitbart News's Kristina Wong on Twitter, Truth Social, or on Facebook.***

However, even if the vaccines function the same way — similar to how a name-brand medication and a generic version may function the same way — the FDA and various court filings use the term "legally distinct," meaning that as a matter of law they are two different medications. One has received FDA approval, and the other only has an EUA.

Comirnaty has not been widely available in the U.S. for reasons that are not clear. In July 2022, the FDA reissued its EUA of the Pfizer BioNTech COVID-19 vaccine, noting, "There is no adequate, approved, and available alternative to Pfizer-BioNTech COVID-19 Vaccine to prevent COVID-19."

Breitbart News sent a query to Pfizer on Friday regarding the availability of Comirnaty in the U.S., but did not receive a response.

To date, the Army has discharged at least 1,699 soldiers, the Air Force has discharged at least 834 service members, the Navy has discharged at least 1,533 sailors, and the Marine Corps has discharged at least 3,436 Marines.

Their discharges have not been "honorable," which indicates the service member was kicked out of the

# Exhibit 4

UNCLASSIFIED//AIUO

(U//AIUO) Disseminating or sharing any part of this document outside CIA must comply with AR 10-16.

AR 4-16 (U) Termination of Employment (Formerly AR 13-8)

DS - Agency Regulation Series 4 (Conduct, Accountability, Discipline) Published on 11 December 2006

Revision Summary

(U//AIUO) AR 4-16 *Termination of Employment* is being administratively revised to reflect the title change from Associate Deputy Director of the Central Intelligence Agency (ADD/CIA) to Chief Operating Officer of the CIA (COO), effective 01 June 2017. The titles of Chief, Security Center (C/SC) and Deputy Chief, Security Center (DC/SC) were updated to the current titles of Director, Office of Security (D/OS) and Deputy Director, Office of Security (DD/OS).

Regulation Summary

(U) This regulation sets forth circumstances under which Agency employment may be terminated and provides for the manner in which such employment terminations may be effected.

I.       (U) Authorities

(U) All employment terminations, other than by mandatory or involuntary retirement under the Central Intelligence Agency Retirement Act of 1964 for Certain Employees, as amended (50 U.S.C. Sec. 2001 *et seq.*), shall be pursuant to the Director of the Central Intelligence Agency's (D/CIA's) statutory authority, including section 104(g) of the National Security Act of 1947, as amended (50 U.S.C. Sec. 403-4(g), which states that:

> (U) "Notwithstanding the provisions of any other law, the Director of the Central Intelligence Agency may, in the Director's discretion, terminate the employment of any officer or employee of the Central Intelligence Agency whenever the Director shall deem such termination necessary or advisable in the interests of the United States. Any such termination shall not affect the right of the officer or employee terminated to seek or accept employment in any other department or agency of the Government if declared eligible for such employment by the Office of Personnel Management."

(U) By the terms of this statute, to terminate the employment of an Agency officer or employee, the Director of the Central Intelligence Agency (D/CIA) need only deem employment termination necessary or advisable in the interests of the United States. It is not required that an employment termination under this statute be in the interests of the national security, but only that the D/CIA, in his discretion, must deem such termination to be in the interests of the United States. Notwithstanding any provisions of this regulation or any other regulation, document, or law, the D/CIA need not provide to anyone the reasons for such termination if he decides not to do so. Any decision not to provide the reasons for employment termination is entirely discretionary, and a national security basis for such a decision is not required. However, under the terms of this statute, the decision of the D/CIA to terminate the employment of an Agency employee, regardless of the reasons for such termination, does not foreclose the employee from

UNCLASSIFIED//AIUO

UNCLASSIFIED//AIUO

other employment with the Federal Government. Employment may be terminated by the D/CIA or by an official of the Agency to whom the D/CIA delegates appropriate authority. No redelegations of this authority shall be made by officials to whom this authority has been delegated except to Agency personnel lawfully designated to act in the capacity of such officials in their absence. Any reference in this regulation to the D/CIA shall be deemed to include Agency officials to whom appropriate authority has been delegated.

II.    (U) Policy

# A.    Tenure

Agency employees do not have tenure and their employment may be terminated pursuant to the terms of the National Security Act of 1947, as amended, without regard to the procedural requirements of this regulation or any other provisions of law. Except as provided by this regulation and AR 13-5, the termination of an Agency employee is not subject to appeal under the provisions of any regulation, document, or law. Notice is hereby given that nothing in this regulation or in any other regulation, document, or law shall be construed as creating for any employee any property or other interests or privileges in his or her employment.

# B.    Circumstances for Termination of Employment

## 1.    Termination for Failure to Complete Trial Period Satisfactorily

Any employee determined to be unsuitable for Agency employment during the trial period may be terminated from the Agency. (See AR 4-15 (formerly AR 20-24))

## 2.    Termination Prior to Expiration of Contract

For contract employees, the term clause of the contract relating to termination of employment prior to the expiration of the contract will govern termination. However, nothing in the contract shall be construed to prevent the Director, Office of Security (D/OS) or designee from suspending or revoking a contract employee's access to classified information at any time.

## 3.    Termination for Failure to Meet the Work and Efficiency Requirements of the Agency

Any employee who fails to meet Career Service work and efficiency requirements or to perform assigned duties adequately may be terminated from the Career Service and the Agency.

## 4. Termination for Failure to Meet Security Standards

Any employee who fails to meet the Agency's security standards may be terminated from the Agency. Any determination that an employee fails to meet security standards may be appealed only pursuant to the provisions of AR 7-7 (formerly AR 10-16).

## 5. Termination for Failure to Meet Medical Standards

Any employee who fails to meet the Agency's medical standards may be terminated from the Agency.

## 6. Termination for Failure to Meet Agency Standards of Conduct

The Agency standards of employee conduct are set forth in AR 4-1, Standards of Conduct (formerly AR 13-1); AR 13-1, Conflict of Interest, Lack of Impartiality, and so forth (formerly AR 13-2). An employee may have his or her employment terminated for failure to meet these standards.

## 7. Termination for Abandonment of Position

Any employee who fails to report for scheduled duty for more than ten consecutive workdays without being on approved leave may be terminated from employment for abandonment of position.

## 8. Termination upon Determination of Legal Incompetence

An employee who is declared by a court of competent jurisdiction to be mentally incompetent may be terminated from employment.

## 9. Termination of Excess Personnel

An employee who is found to be excess to the needs of the Agency may be terminated from employment. An employee may be determined to be excess to the needs of the Agency if his or her Career Service has declared the employee excess and a job search within the Agency is unsuccessful or is not requested by the employee. The grounds for declaring an employee excess to Career Service needs are:

a.    The Career Service is over strength overall or in a particular grade or functional element.

b.    There is no longer a requirement in the Career Service for the particular skills or qualifications possessed by the employee.

c.    There is a reduction or elimination of the functions of the Career Service, thereby requiring a reduction in staff.

## 10.    Termination Prior to Not-to-Exceed Date of Reserve Appointment

A Reserve Employee may be terminated from employment prior to the not-to-exceed date of his or her appointment if the employee's services are no longer needed, the employee's performance has been inadequate, the employee is not suitable for continued Agency employment, the employee's security clearance has been revoked, or termination of employment otherwise is deemed to be necessary or advisable in the interests of the United States.

## 11.    Termination in Other Circumstances

In addition to the circumstances specified in paragraphs 1 through 10 above, an employee may have his or her employment be terminated whenever the D/CIA, in his discretion, deems such termination necessary or advisable in the interests of the United States.

## C.    Procedures for Termination of Employment

Except as noted in paragraphs C.1. to C.6. and paragraph D. below, terminations pursuant to this regulation shall be carried out in accordance with the procedures set forth in AR 4-2 (formerly AR 13-3) and AR 4-6 (formerly AR 13-5). Notwithstanding any other provision of this regulation, all termination recommendations shall be routed through the Office of General Counsel (OGC).

## 1.    Procedures for Termination Prior to Expiration of Contract

For contract employees, the term clause of the contract relating to termination of employment prior to the expiration of the contract will govern termination. Directors or Heads of Independent Offices who exercise operational control over contract employees may terminate a contract. However, nothing in the contract shall be construed to prevent the D/OS or designee from suspending or revoking a contract employee's access to classified information at any time. The PEB ordinarily will not be convened for separation of contract employees.

## 2.    Procedures for Termination for Abandonment of Position

If an employee fails to report for duty or to return from leave, an effort will be made to determine the employee's intentions. If the employee's intentions cannot be determined within 10 business days or if it appears that the employee intentionally abandoned his or her position, Chief, Human Resources may terminate the employee from the Agency for abandonment of position. The termination will be effective at close of business on the last day of active duty or of approved leave, whichever is later. The PEB ordinarily will not be convened for separation of employees who have abandoned their positions. Unless security considerations dictate otherwise, the Special Activities Staff, Security Center (SAS/SC) will mail notice of termination to the employee's last known address. If security conditions preclude notice by mail, other reasonable efforts to notify the employee will be undertaken. If subsequent evidence indicates that the abandonment was not the employee's fault, the employee will be reinstated by Chief, Human Resources and paid appropriately as if the termination had not occurred.

## 3.    Procedures for Termination for Legal Incompetence

Upon a judgment by a court of competent jurisdiction that an employee is legally incompetent, Chief, Human Resources may terminate the employee from the Agency unless the employee is determined to be eligible for disability retirement. When a decision is made to terminate employment due to legal incompetence, SAS will notify the employee's legal guardian in writing about the action to be taken. The PEB ordinarily will not be convened for separation of employees who have been declared legally incompetent.

## 4.    Procedure for Termination of Excess Personnel

*a.*    In considering whether an employee is excess to the needs of a Career Service, the Head of the Employee's Career Service will take into consideration the current and anticipated requirements of the Career Service for employees with certain qualifications, skills, experience, training, and so forth. In any case involving an employee with a disability who is unable to perform essential job functions with or without reasonable accommodation, the decision to declare the employee excess to the needs of the service must be in accordance with the provisions of AR 3-25 (formerly AR 9-4).

*b.*    If the head of a component determines that an employee is excess to the needs of the component, both the Head of the Career Service and the employee will be advised in writing. If the employee wishes, the Career Service will make an effort to arrange placement in another component within that Career Service. If such efforts fail, the Career Service will declare the employee excess to the

needs of the Career Service and will notify the employee, Chief, Human Resources, and D/OS, via SAS.

c.  A representative from SAS will then meet with the employee and determine if the employee wishes placement elsewhere in the Agency at the same or different grade. If the employee wishes placement elsewhere in the Agency, SAS will broker an Agency-wide placement effort. If the employee does not wish placement elsewhere in the Agency or if placement efforts are unsuccessful after a sufficient interval of time, SAS shall so notify Chief, Human Resources in writing. Chief, Human Resources shall then forward a recommendation to separate the employee to the Chief Operating Officer (COO) for decision. The PEB ordinarily will not be convened for separation of employees who have been determined to be excess to the needs of the service.

## 5.  Procedures for Termination of Employment of DNI/OSC Alien Employees

The D/DNI/OSC has developed procedures for the termination of DNI/OSC alien employees. These are the only procedures for termination of DNI/OSC alien employees and any change in these procedures must be reviewed by OGC prior to adoption of the changes. These standard procedures shall not affect the discretionary authority delegated to the D/DNI/OSC by Section III. below to terminate the employment of DNI/OSC alien employees without procedures.

## 6.  Procedures for Termination of Reserve Employment Prior to Not-to-Exceed Date of Reserve Employment

The employment of a Reserve Employee may be terminated by Chief, Human Resources at any time prior to the not-to-exceed date of the employee's appointment if Chief, Human Resources determines that the employee's services are no longer needed, the employee's performance has been inadequate, the employee is unsuitable for continued Agency employment, the employee's security clearance has been revoked, or Chief, Human Resources determines termination is otherwise deemed necessary or advisable in the interests of the United States. Before making such a determination, Chief, Human Resources shall follow the procedures set forth in AR 4-2 (formerly AR 13-3) and AR 4-6 (formerly AR 13-5) except that the decision of Chief, Human Resources is final and not appealable by the employee.

## D.  Termination Without Procedures

Pursuant to statutory authority, any employee may be terminated from the Agency at any time

without regard to any procedural steps set forth in this regulation or elsewhere when the D/CIA, in his discretion, deems it necessary or advisable in the interests of the United States. The decision by the D/CIA to exercise this authority is entirely discretionary. The D/CIA need not provide to anyone the reasons for exercising this authority, and a national security basis for the exercise of this authority is not required. The existence or the exercise of this discretionary authority by the D/CIA is:

1.      Not constricted, limited, affected, or otherwise controlled by any of the procedures set forth in this regulation or any other regulation, document, or law.

2.      In abrogation of the existence of any interests or privileges of any employee in his or her employment which might otherwise be created or established by this regulation or any other regulation, document, or law.

## E.  Appeal of Termination Decision

1.      Contract employees, reserve employees, and DNI/OSC alien employees have no right of appeal.

2.      When employment is being terminated because of revocation of access to classified information, the procedures for all employees to appeal the revocation decision shall be those set forth in AR 7-7 (formerly AR 10-16).

3.      In all other cases, the termination decision may be appealed to the COO. SAS shall advise the employee that he/she has ten calendar days from the date of receipt of the notification of the termination decision to submit written comments to SAS. In cases where the employee requests access to Agency regulations or other relevant materials, the employee shall have ten calendar days from receipt of the requested materials or notice that the materials will not be provided to submit written comments to SAS. SAS shall make the employee's written comments available to the COO and notify the employee in writing of the COO's decision. In cases where the COO is the terminating authority, for example in cases where an employee is declared excess to the needs of the service, the employee may appeal directly to the D/CIA.

4.      Employees may appeal to the D/CIA in cases where the COO denies the initial appeal or where the COO serves as the terminating authority. The employee shall have ten calendar days from receipt of the COO's decision to submit written comments through SAS to the D/CIA. The employee must prepare any classified written comments to the COO or to the D/CIA at a secure facility designated by D/OS or designee. Upon receipt of an appeal, the D/CIA will decide, in his discretion, whether to terminate the individual's Agency employment pursuant to the D/CIA's statutory authority to do so. SAS

shall notify the employee in writing of the D/CIA's decision.

## F.    No Additional Rights Conferred

Nothing in this or any other Agency regulation or policy statement should be construed to create or confer on any person or entity any right to administrative or judicial review of Agency employment termination procedures, their implementation, or decisions or actions rendered thereunder. Neither this nor any other Agency regulation or policy statement creates or confers any right, benefit, or privilege, whether substantive or procedural, for continued Agency employment. Finally, neither this nor any other Agency regulation or policy statement creates or confers any substantive or procedural right, benefit, or privilege enforceable by any party against the Agency, any Agency instrumentality, or any Agency officer or employee, or any other person acting for or on behalf of the Agency.

## G.    Opportunity to Resign: Resignation in Lieu of Termination

1.    An employee may proffer a resignation at any time before the meeting of an advisory board, as described in AR 4-2 (formerly AR 13-3), or if no advisory board meets, at any time before the decision of an appropriate official to separate the employee. In such circumstances, the separation will be recorded as a voluntary resignation unless the D/CIA, DD/CIA, COO, D/OS, Chief, Human Resources or, for DNI/OSC alien employees, D/DNI/OSC declines to accept the resignation. If a decision is made not to accept a resignation, the D/CIA, DD/CIA, COO, D/OS, Chief, Human Resources or D/DNI/OSC, as appropriate for the category of employee, may terminate the individual's employment and the employment termination will be recorded as an involuntary separation.

2.    An employee who resigns after a decision has been made by DD/OS to revoke the employee's access to classified information or a decision has been made by Chief, Human Resources, with concurrence by the Head of the employee's Career Service, to separate the employee for non-security reasons will be considered to have resigned in lieu of termination and the separation will be recorded as resignation in lieu of termination. An employee who resigns in such circumstances shall be ineligible for separation compensation under AR 5-16 (formerly AR 20-32). However, a resignation tendered and accepted as outlined above shall be deemed to constitute an involuntary separation solely for purposes of determining whether the individual is eligible for a discontinued service retirement annuity under the Civil Service Retirement System or the Federal Employees Retirement System.

3.    Once a final decision is made to involuntarily separate the employee, it will be recorded as an involuntary separation.

4.    The status of the employee's separation, that is, voluntary separation, resignation in lieu of termination, or involuntary separation will be described to state unemployment compensation authorities and/or private sector employers who properly inquire.

5.    An employee who submits a resignation before final COO, DD/CIA, or D/CIA review of an appeal will be notified prior to formal acceptance of the resignation that acceptance of the resignation will terminate further processing of the appeal.

6.    If, after a termination recommendation has been made, an employee submits a resignation effective at a future date, D/OS or designee will consult with appropriate officials and determine whether the interests of the U.S. require continuation of procedures to effect an earlier termination.

7.    D/OS, in his or her discretion and in accordance with applicable law, may waive any of the provisions of paragraphs 1 through 6 above if D/OS determines such a waiver or waivers would be beneficial to the interests of the Agency.

## H.    Disclosure or Dissemination of Reasons for Termination or Resignation of Employment

1.    Generally, the reasons for the termination or resignation of Agency employment shall not be disseminated outside the Agency to any private organization or Federal or other governmental body without the consent of the employee. Absent such consent, and subject to the exceptions noted below, responses to requests for information as to why an individual's employment was terminated shall be limited to a statement that the employment was terminated pursuant to statutory authority. Nothing in this section (section H) shall limit the dissemination of:

*a.*    Intelligence or counterintelligence information;

*b.*    Information relevant to lawful personnel, physical, or communications security investigation or proceeding or a hiring, licensing, or similar decision by another Federal agency;

*c.*    Information pursuant to a prior written acknowledgment of the employee that the information may be disclosed to other Federal, state, or local government agencies for investigative, administrative, or legal action;

*d.*    Information concerning possible violation of Federal criminal law, as required by section l.7(a) of Executive Order 12333 and/or 28 U.S.C. Sec. 535; and/or

*e.*    Information necessary to protect an individual's life or physical safety or the

public health or safety.

2.      The D/CIA, DD/CIA, COO, D/OS, or DD/OS in each official's discretion, may waive the provisions of this section (section H) and authorize a disclosure that otherwise would not be permitted under this regulation, provided that the disclosure is permissible under the Privacy Act of 1974, as amended (5 U.S.C. 552a), the Agency's Privacy Act regulations, and Executive Order 12333 and the implementing procedures for that order.

3.      This regulation does not require the D/CIA to disclose the reasons for termination of employment if, in the exercise of his discretion under law, he decides not to do so.

III.      (U) Responsibilities

The termination authority of the D/CIA is delegated to:

A.      The Deputy Director of the Central Intelligence Agency (DD/CIA) upon the recommendation of an advisory board.

B.      The Chief, Human Resources with respect to any employee who is:

1.      Recommended by the Personnel Evaluation Board (PEB) for termination for suitability reasons such as misconduct or substandard performance. (see AR 14-6 (formerly AR 13-5));

2.      Found to have abandoned his or her position;

3.      Judged to be legally incompetent; or,

4.      Serving under a Reserve Employee appointment [see AR 3-2 (formerly AR 20-2)].

C.      The Director of National Intelligence, Open Source Center (DNI/OSC) with respect to DNI/OSC alien employees.

D.      Directors or Heads of Independent Offices with respect to contract employees.

E.      The COO is delegated the authority to decide the first-level appeals of employees recommended for termination and to terminate the employment of such employees upon recommendation of an advisory board. The COO also has authority to terminate the employment of an employee who has been declared to be excess to the needs of the service.

F.      The COO, as Chairman of the Panel established under AR 7-7 (formerly AR 10-16) to review security decisions to revoke employees' access to classified information, is delegated authority to terminate employment of any employee whose security revocation has been upheld by the Panel.

UNCLASSIFIED//AIUO

**G.**     The Deputy Director, Office of Security (DD/OS) is delegated authority to terminate the employment of any employee who chooses not to appeal or request a review of a security revocation decision.

# Exhibit 5

# BREITBART

## EXCLUSIVE: SENIOR CIA OFFICIAL WHO FACILITATED BIDEN'S MILITARY COVID-19 VACCINE MANDATE FIRED



AP Photo/Susan Walsh

*by* KRISTINA WONG ┊ 8 Apr 2025

Terry Adirim, a senior Central Intelligence Agency official and former senior defense official who played a pivotal and potentially illegal role in the Biden Administration's military vaccine mandate, was recently fired from the agency, a source has exclusively revealed to Breitbart News.

Adirim, a former senior Biden appointee at the Department of Defense who was performing the duties of the assistant secretary of defense for health affairs, had decamped in December to the CIA as director of CIA Centers for Global Health Services until about a week ago, according to the source.

Her firing was related to her role in forcing service members to choose between taking a vaccine that was under Emergency Use Authorization or being kicked out, according to the source.

On September 14, 2021, about a month after then-Defense Secretary Lloyd Austin ordered the vaccine mandate, Adirim issued a memo instructing DOD health care providers to consider the vaccine available to service members — Pfizer's BioNTech vaccine — as "interchangeable" with a vaccine that was approved by the FDA, known as Comirnaty.

She wrote:

> Per FDA guidance, these two vaccines are 'interchangeable' and DoD health care providers should 'use doses distributed under the EUA to administer the vaccination series as if the doses were the licensed vaccine.'
>
> Consistent with FDA guidance, DoD health care providers will use both the PfizerBioNTech COVID-19 vaccine and the Comirnaty COVID-19 vaccine interchangeably for the purpose of vaccinating

Service members in accordance with Secretary of Defense Memorandum, 'Mandatory Coronavirus Disease 2019 Vaccination of Department of Defense Service Members,' August 24, 2021.

Her memo was considered legally dubious even inside the Pentagon, as Breitbart News reported in September 2022.

A month after Adirim issued her memo, a senior defense official proposed allowing service members who did not want to take the EUA vaccine to wait for the FDA-approved vaccine before facing punishment for being unvaccinated.

Deputy Assistant Secretary of Defense for Health Readiness Policy and Oversight David J. Smith, proposed in a draft memo that would replace Adirim's memo:

> If a Service member, after medical counseling, declines administration of the EUA-manufactured product, DoD health care providers should engage with their logistics chain to secure and administer the [Biologics License Application]-manufactured Pfizer-BioNTech/Comirnaty product prior to any punitive action being taken against the Service member.

Smith's action memo was addressed to Adirim, with a recommendation for her to sign the draft memo with the proposed change.

According to the documents obtained by Breitbart News, the draft memo had been sent to the military services for coordination, and a senior Air Force official objected to it, arguing that adopting the change could open the military up for more litigation and possibly force it to reverse punishments already given for not taking the vaccine.

His response said the proposed change would suggest that DOD considers the EUA-manufactured vaccine different from the FDA-approved Comirnaty product and could open the Air Force up to lawsuits, and that since adverse action had already possibly been taken,

"significant remedial actions" would probably be required.

The proposal was never adopted, with legal implications for the DoD.

Under 10 U.S.C. Section 1107(a), a defense secretary can order service members to take an FDA-approved vaccine, but he cannot legally order service members to take an EUA-manufactured vaccine without seeking and obtaining a waiver from the president.

Also under 10 U.S.C. Section 1107(a), that waiver must be signed by the president then the defense secretary must formally notify Congress of the waiver. Congress has never received notification of such a waiver.

Austin had pledged in an August 9, 2021, memo to service members that he would seek a presidential waiver, but it is not clear he ever did so. He also pledged that his order would only use the FDA-approved vaccine. Breitbart News questioned the Biden Pentagon if Austin ever sought a presidential waiver to mandate the EUA-manufactured vaccine, but was given the same verbiage that appeared in Adirim's memo:

> Per FDA guidance, the Pfizer-BioNTech COVID-19 vaccine and the Comirnaty COVID-19 vaccine had the same formulation and the two vaccines were 'interchangeable.' Accordingly, DoD health care providers could 'use doses distributed under the EUA to administer the vaccination series as if the doses were the licensed vaccine.'

Comirnaty has not been widely available in the U.S. for reasons that are not clear. In July 2022, the FDA reissued its EUA of the Pfizer COVID-19 vaccine, noting, "There is no adequate, approved, and available alternative to Pfizer-BioNTech COVID-19 Vaccine to prevent COVID-19."

The DOD later would be hit with lawsuits from service members suing the DOD for trying to force service members to take the EUA vaccine instead of the FDA-approved vaccine.

One of the lawsuits was led by former Marine Capt. Dale Saran, the military attorney who ended the Pentagon's

anthrax vaccine in 2004. In an interview with Breitbart News in 2022, he called Adirim's memo a "fraud." he said:

> The undersecretary of defense for health affairs, a woman named Terry Adirim, published a memo claiming that the unlicensed product, BNT162b2 — Pfizer's unlicensed EUA product — could be substituted in that it was interchangeable with the licensed product. … . That's the fraud that's at the heart of our case.

> If you are not voting blue this election then you're voting to end our Democracy. Please take a moment to donate and/or share this link. We need this win for the right to choose and for America! #VoteBlueForDemocracy

He included a link to ActBlue, a fundraising organization for the Democratic National Committee.

It would not be the first time Adirim would appear to skirt the law.

Adirim left the DOD in 2022 to go to the Department of Veteran Affairs, where she appeared to have violated the Hatch Act, as previously reported by Breitbart News. Just weeks before the 2022 midterm elections, Adirim liked a tweet soliciting donations to Democrats. Doing so is not allowed under the Hatch Act, which seeks to make sure federal employees do not engage in politics while in an official role.

The tweet, by a doctor named Mark Shrime on October 30, said:

According to the Hatch Act, a federal employee — even when not on duty — cannot "like" a post soliciting political contributions at any time.

The Office of Special Counsel (OSC) states in its Hatch Act guidelines for federal employees on social media: "No federal employee may 'like' a post soliciting for partisan political contributions at any time."

***RELATED: Former Green Beret Details His Experience Resisting Forced Coronavirus Vaccination***

The guidelines also state: "Liking, Sharing, or Retweeting Solicitations Rule: Employees, even when not on duty or in the workplace, may not like, share, or retweet a post that solicits political contributions, including invitations to fundraising events."

Asked if Adirim violated the Hatch Act, then-VA Press Secretary Terrence Hayes said in a statement:

> VA will not comment on personnel matters and notes that by law, the Office of Special Counsel has exclusive authority to render advisory opinions on and investigate allegations of political activity prohibited by the Hatch Act; and the Merit Systems Protection Board has exclusive authority to determine whether a violation of the Hatch Act has occurred.

After Breitbart News' query, Adirim unliked the tweet.

Adirim has since protected her X account, but has been voicing support for vaccines on her Bluesky account.

More than 8,700 service members were forced out of the military over the vaccine mandate, and tens of thousands more are estimated to have voluntarily left.

Since taking office again in January, the Trump administration has been trying to undo the damage caused by the Biden administration's vaccine mandate. President Donald Trump in January signed an executive order to reinstate service members who were kicked out along with backpay and their same rank, and is also welcoming back those who voluntarily left, but without backpay and a minimum of two years of service.

Defense Secretary Pete Hegseth followed up with a directive to the services to implement the executive order and on Monday, the Pentagon announced it would be contacting every service member who was kicked out over the vaccine with further instructions on how to be reinstated. Chief Pentagon Spokesman Sean Parnell said in a statement:

> We're committed to doing right by those who were affected by the Department's former COVID-19 vaccination policy. For the roughly 8,700 service members who were separated solely for refusing the vaccine, this is an opportunity to return to service-and we want them to know the door is open.
>
> Starting today, the Department will begin outreach to ensure each of these individuals receives clear information on how to pursue reinstatement.

He said they have until April 1, 2026, to pursue reinstatement.

"We're working hard to make sure each of them receives clear information and support throughout the process. Their service mattered then, and it still matters now. We're ready to welcome them back!" he added.

***Follow Breitbart News's Kristina Wong on*** *X, Truth Social,* ***or on*** *Facebook.*

# **Exhibit 6**

*The Atlantic*

My Account          Give a Gift

**More From 2024 Elections**

Explore This Series

POLITICS

# Trump's 'Secretary of Retribution'

A retired soldier turned election denier is keeping a list of the former president's "deep state" enemies.

By Shane Harris



Illustration by Allison Zaucha / The Atlantic. Sources: Stephen Maturen / Getty; Amanda Andrade-Rhoades / Reuters; Getty.

NOVEMBER 2, 2024

SHARE AS GIFT 🎁     SAVE 🔖



**Listen**

—  1.0x  +

0:00                    15  ▶  15                    13:20

Produced by ElevenLabs and <u>News Over Audio (Noa)</u> using AI narration. Listen to more stories on the Noa app.

I N JUNE, IVAN RAIKLIN, a retired Green Beret and pro–Donald Trump activist, sat down for a chat with Cliven Bundy, a Nevada cattle rancher who instigated an armed standoff with federal authorities in 2014 over his refusal to pay grazing fees.

In the video—posted on the America Happens Network, which has aired documentaries such as *Bundy vs. Deep State* and the series *Conspiracy Truths*—Raiklin <u>explained</u> that tens of thousands of service members had refused to comply with a Defense Department mandate that all personnel receive a vaccine for COVID-19, because they did not want to be "experimented on with an unsafe and ineffective, what I call 'DNA-mutilation injection.'" He told Bundy that the "illegal" mandate, since rescinded, was to blame for the "total destruction of our constitutional order."

"There must be consequences," Raiklin said, for the "unlawful, immoral, unethical, illegal" vaccination program, which he also asserted, with no evidence, "ended up killing lots of people." In fact, tens of thousands of service members did refuse the vaccine, and about 8,000 were discharged for failing to comply with the policy. But Raiklin speculated that as many as 1 million more still in uniform might "want to participate in retribution" against Pentagon leadership. (Depending on where in the world they serve, military personnel are <u>required</u> to receive about a dozen other vaccinations, including for polio, influenza, and typhoid.)

*Retribution* is Raiklin's watchword these days. He calls himself Trump's "secretary of retribution," settling scores from the first term and ready to do the same in a potential second. His battles aren't only with military leaders. After Trump lost the presidency in 2020, Raiklin suggested that Vice President Mike Pence could reject electors from

the states that Joe Biden had won, on the grounds that they might be fraudulent. Those ideas were later taken up by John Eastman, a lawyer who has been indicted in Arizona for his alleged efforts to overturn the 2020 election results there. (He has pleaded not guilty.) Raiklin may be one of the intellectual founders of Trump's election denialism.

From the January/February 2024 issue: If Trump wins

More recently, Raiklin, who left the Army Reserve in 2022 at the rank of lieutenant colonel, according to an Army spokesperson, has promoted the potentially illegal idea that state legislatures could withhold their electors in the event that Trump loses. He has shown up in swing states, including North Carolina, where he pushed for lawmakers to award the electors to Trump ahead of time, on the theory that Hurricane Helene had disrupted the casting of ballots in the state.

Raiklin's ideas for ensuring a Trump victory dovetail with the plans he has hinted at for exacting retributive justice on government officials. In his conversation with Bundy, Raiklin said that he would like to "coordinate" with those members of the armed forces supposedly still aggrieved over mandatory vaccinations, "to channel those skills, training, passion, in a positive way, to kind of autocorrect the lawlessness and to create consequences for those who created that lawlessness."

Raiklin did not explicitly call for violence, even though he praised Bundy as "quite the legend" for his aggressive opposition to federal authority. Rather, he said he wanted "appropriate lawful justice"—but archly suggested that this should come from outside the court system. Raiklin chooses his words carefully, even when they are freighted with menace. Bundy asked how the ex-

## RECOMMENDED READING



Abolish the Priesthood    

JAMES CARROLL



The Dark Side of Saying Work Is 'Like a Family'

JOE PINSKER

soldier would treat the federal prosecutors in his own case, and Raiklin replied calmly, "I would conduct the most peaceful and patriotic legal and moral and ethical actions that they've ever experienced in their life."



The American System of Tipping Makes No Sense

DEREK THOMPSON

A New York native with a degree from the Touro Law Center, in Central Islip, Raiklin describes himself as a constitutional lawyer. He served as an intelligence officer in the National Guard in several states as well as in the regular Army, deploying to Jordan and Afghanistan. Among his numerous commendations and awards is the Bronze Star Medal, given for meritorious service or acts of valor in a combat zone.

He has suggested that military personnel could be "deputized by sheriffs," as he told Bundy in their conversation. This idea is rooted in the fringe theory that local sheriffs possess law-enforcement authority superseding that of any elected official or officer, at any level of government. Proponents of the so-called constitutional sheriffs' movement urged sheriffs to investigate disproven claims of election fraud in 2020 and to get involved this year in election administration.

Bundy seemed a bit daunted by the scale of resistance that Raiklin described to him. The federal bureaucracy is "so broad," he said, that it's practically immovable. Raiklin reassured him: "That's where people like me come into play, that know the system very well and in detail, to create priorities. You start with the top, and you work your way through the system."

To guide that work, Raiklin has created a "deep-state target list," with the names of more than 300 current and former government officials, members of Congress, journalists, and others who he thinks deserve some of that "lawful justice." The names of some of their family members are also included.

The list, which is helpfully color-coded, reads like a greatest hits of all the supposedly

corrupt plotters who Trump and his supporters allege have targeted *them*. Among others, it includes FBI officials who worked on the investigation into potential links between Trump's 2016 presidential campaign and Russia; lawmakers and congressional staff who managed both Trump impeachments; members of the Capitol Police who defended Congress from pro-Trump rioters on January 6, 2021; witnesses who later testified to Congress about the attack; and the senior public-health officials who led the federal government's response to the coronavirus pandemic. As if to demonstrate that even the closest of Trump's allies can still be in league with the forces of government treachery, the former president's son-in-law, Jared Kushner, who helped speed development of the COVID vaccine as a member of Operation Warp Speed, also made Raiklin's list.

Several former intelligence officials Raiklin has singled out told me they are well acquainted with his threats. They presume that if Trump is reelected, the Justice Department, the IRS, and other federal agencies will conduct capricious audits and frivolous investigations, all designed, if not to put them in prison, then to spend large sums of money on legal fees. A few told me they worried that Raiklin would publish their addresses or details about their families. They were less concerned about him showing up at their home than about some unhinged deep-state hunter he might inspire. In interviews with right-wing podcasters, Raiklin has said he would conduct "livestreamed swatting raids" against his targets. Swatting is the illegal practice of falsely reporting an emergency in order to summon armed law enforcement to someone's home.

Raiklin's future in a Trump administration is uncertain. But he is close to major figures in Trump's orbit, particularly Michael Flynn, the former national security adviser who was indicted for lying to the FBI. Trump pardoned him in November 2020.

Raikiln is also a board member of America's Future, a nonprofit organization that has pursued conservative causes for decades, of which Flynn is the chair. Other board members have amplified the "Pizzagate" conspiracy theory—promoted by the QAnon movement, of which Flynn is an ally—that some Democratic politicians kidnap,

torture, and eat children.

Like Raiklin, Flynn has long railed against suspected deep-state actors, whom he has accused of torpedoing his career in intelligence. Flynn was regarded as a brilliant tactical intelligence officer when he served in Afghanistan and Iraq. But after he became the director of the Defense Intelligence Agency, senior intelligence officials worried that his erratic management style and conspiratorial attitudes made him unfit for the job. Top intelligence officials pushed Flynn out in 2014, after an unhappy and sometimes-tumultuous two-year tenure. James Clapper, who was the director of national intelligence at the time, is on Raiklin's list.

A few years later, Trump named Flynn to be his national security adviser, a position he held for just 24 days. Flynn resigned in February 2017, following revelations that he'd had contact with Russia's ambassador to the United States and given misleading statements to senior administration officials.

A Trump-campaign official told me that Raiklin has "no role or affiliation with the campaign." Raiklin seems to like to suggest a relationship by promoting his physical proximity to Trump. In a post on X, he shared a photo of himself standing feet from Trump while he spoke from the lectern at an unidentified rally. Also standing nearby was Kash Patel, a fierce Trump loyalist said to be on a shortlist for a senior national-security position in a second Trump administration, possibly director of the CIA.

From the October 2024 issue: The man who will do anything for Trump

Raiklin is not shy about his aspirations. I sent him an email, requesting an interview about his deep-state list. Rather than reply, he posted a screenshot of my message on X and said he would "much rather discuss" the subject, as well as the direct appointment of electors through state legislatures, "with Americans operating in good faith." He suggested a number of conservative podcasters he thought fit the bill.

Raiklin invited me to post my questions on X, "in the interest of public transparency and exposure and [to] show the world you are operating in good faith." So I did.

"What is the purpose of this list?" I asked. "Why did you select these people? Do you intend to do anything to the people on this list?"

Raiklin replied with links to videos of interviews he had already done with conservative media figures, including the former television star Roseanne Barr. On her show, Raiklin explained that although the deep state went by many other names —"permanent Washington," "the Uniparty," "the duopoly"—"I just simply call them war-criminal scum."

"I happen to be the guy that said, *You know what? I've had enough*," he said. "Let me expose them by name, date, place, transgression, category. And let's start educating the country on who they are, so that they're not able to walk anywhere, whether it's in the digital space or physical space, without them feeling the, let's just say, wrath of their neighbors, friends, relatives, family."

Barr then sang to Raiklin lyrics from "The Ballad of the Green Berets," to his obvious delight.

It's hard to know whether Raiklin is a true believer—and potentially dangerous—or just a profiteering troll. His unwillingness to respond to direct questions from a journalist suggests the latter.

After I pressed Raiklin to answer me, rather than post interviews he'd done with friendly hosts inclined to agree with him, he invited me to direct further questions through Minnect, an app that lets you solicit advice from self-professed experts. According to his Minnect profile, Raiklin's current rate for answering a question via text is $50. For $100, he'll provide a recorded video response. A video call, "for the most personalized advice," will run you $20 a minute, with a 15-minute minimum.

"Are you asking me to book you for a fee?" I wrote in his X thread. I wanted to be sure I correctly understood Raiklin's proposal. He replied, "And 50% of the revenue created from the article you write. Send the contract to [his email] for my team to review."

I declined.

A few days later, he was back to campaign work, exhorting state officials to intervene in the presidential election.

"Republican State Legislatures just need to hand their States' electors to Trump, just like the Democrat elites handed the primary 'win' to Kamala Harris," he wrote Wednesday on X, adding, "276 electors on Nov 5 ... CheckMate! Then we can Castrate the Deep State and Crush the Commies immediately on January 20, 2025."

# ABOUT THE AUTHOR



**Shane Harris**

⭕ **Follow**

Shane Harris is a staff writer at *The Atlantic* covering national security and intelligence. He can be reached on Signal at shaneharris.64.

———————————

**Explore More Topics**

Donald Trump

# Exhibit 7

# *Trump Fires 6 N.S.C. Officials After Oval Office Meeting With Laura Loomer*

During the 30-minute meeting, the far-right activist excoriated National Security Council officials in front of the president and Michael Waltz, the national security adviser.

 ▶ **Listen to this article · 10:18 min** <u>Learn more</u>

  

**By Maggie Haberman, Jonathan Swan and Ken Bensinger**
Reporting from Washington

April 3, 2025

President Trump fired six National Security Council officials after an extraordinary meeting in the Oval Office with the far-right activist Laura Loomer, who laid out a list of people she believed were disloyal to the president, U.S. officials said on Thursday.

The firings were described by one of the U.S. officials, who had direct knowledge of the matter. The decision came after Ms. Loomer vilified the staff members by name during a meeting on Wednesday, when she walked into the White House with a sheaf of papers attacking the character and loyalty of numerous N.S.C. officials. Michael Waltz, the national security adviser, joined later in the meeting and briefly defended some of his staff, though it was clear he had little if any power to protect their jobs.

It was a remarkable spectacle: Ms. Loomer, who has floated the baseless conspiracy theory that the Sept. 11 attacks were an "inside job" and is viewed as extreme by even some of Mr. Trump's far-right allies, was apparently wielding

more influence over the staff of the National Security Council than Mr. Waltz, who runs the agency. A longtime supporter of Mr. Trump who has frequently spoken of her desire to work with him, Ms. Loomer was one of Mr. Trump's most vicious online enforcers during the 2024 campaign.

The account of the White House meeting with Ms. Loomer and the subsequent firings is based on interviews with eight people with knowledge of the events. They asked for anonymity to discuss confidential meetings and conversations.

The people fired included Brian Walsh, the senior director for intelligence; Maggie Dougherty, the senior director for international organizations; and Thomas Boodry, the senior director for legislative affairs. None could be reached for comment.

To some in the government, the firings felt arbitrary. Most if not all of the officials who have been targeted by Ms. Loomer were put through a personnel vetting process run by the Trump administration.

Flying to Florida aboard Air Force One late Thursday, Mr. Trump called Ms. Loomer a "great patriot" and denied that she had anything to do with the firings.

"No, not at all," he said.

Mr. Trump, who has sought to avoid the chaos narrative that plagued his first term, was surprisingly matter-of-fact when asked about the firings: "We're always going to let go of people — people we don't like or people that take advantage of, or people that may have loyalties to someone else," he said.

Mr. Waltz was not fired, nor was one of Ms. Loomer's top targets, the deputy national security adviser Alex Wong. Apart from the firings, several other officials who had been detailed to the council were reassigned back to their home agencies over the weekend, even before the White House meeting.

Ms. Loomer, reached by phone, declined to comment. After The New York Times reported on details of the meeting, she confirmed on X that she had attended the meeting but would not provide details. A White House spokesman did not respond

to an email seeking comment, and N.S.C. officials said they would not comment on personnel matters.

Ms. Loomer has been part of a group effort by some Trump allies to disparage members of the White House staff whom they consider too hawkish, too eager to commit American troops around the world and fundamentally at odds with Mr. Trump's "America First" foreign policy.

It is unclear what the firings mean for Michael Waltz, the national security adviser, who has a tenuous hold on his own job. Doug Mills/The New York Times

The agitators have used the phrase "neocon" — short for neoconservative — to describe many of those staff members working for Mr. Waltz.

The roughly 30-minute meeting with Ms. Loomer was also attended by Vice President JD Vance and other senior officials, including the chief of staff, Susie Wiles; the head of the presidential personnel office, Sergio Gor; and Commerce Secretary Howard Lutnick, whose brother died in the Sept. 11 attacks.

A spokesman for Mr. Lutnick did not immediately respond to a message seeking comment.

Ms. Loomer was seated directly across the desk from the president. Also in attendance was Representative Scott Perry, a Pennsylvania Republican who was one of Mr. Trump's biggest allies in his efforts to overturn his 2020 election loss. Mr. Perry brought a separate list of staff concerns he wanted to discuss with the president, and his planned meeting with Mr. Trump collided with Ms. Loomer's, one of the people briefed on the events said.

Mr. Perry did not respond to a text message seeking comment.

It is unclear what the firings mean for Mr. Waltz, who has a tenuous hold on his own job. Mr. Trump has so far declined to terminate Mr. Waltz after he inadvertently invited The Atlantic's editor in chief, Jeffrey Goldberg, into a Signal group chat in which top officials, including Defense Secretary Pete Hegseth, shared sensitive details about forthcoming military strikes against Houthi terrorists.

But senior officials who have discussed Mr. Waltz privately with the president say that Mr. Trump's reluctance to fire him is more a matter of him wanting to avoid bad publicity than a sign of confidence in Mr. Waltz. Mr. Trump has made clear to his staff that he does not want to give the media the satisfaction of seeing Mr. Waltz fired. He also does not want to start the cycle of firing top officials that plagued his first term, they said.

The fact that Ms. Loomer met with the president in the Oval Office was first reported by the newsletter Status, but the details of what was discussed had not been revealed.

It was not clear how she was invited to such a sensitive meeting with the president.

She has rotated in and out of favor with Mr. Trump. During the 2024 race, Ms. Loomer said that "the White House would smell like curry" if Kamala Harris were elected, a jab at her Indian heritage. During the Republican primary campaign, in

which she served as Mr. Trump's attack dog against Gov. Ron DeSantis of Florida, Ms. Loomer floated the baseless notion that Mr. DeSantis's wife, Casey, had lied about having breast cancer.

Mr. Trump distanced himself from Ms. Loomer in the campaign's final stretch after he invited her on his plane to travel to a series of events commemorating Sept. 11, which caused an outcry because of her conspiratorial views about the attacks.

Still, Ms. Loomer has remained in contact with some of Mr. Trump's aides and has, for the most part, fiercely defended the president while blitzing perceived opponents and enemies with searing attacks shared with her 1.5 million followers on X. She has complained in recent weeks that she has not received an invitation to sit in the "new media seat" at White House press briefings. She has applied for a press pass but so far hasn't received one.

Her visit to the White House this week seemed to signal a return to good graces for Ms. Loomer, who in recent weeks has launched a string of social media attacks against Trump administration officials, including Mr. Wong, the deputy national security adviser.

Mr. Trump has spoken somewhat sympathetically about Mr. Wong in some of his private conversations with advisers.

But Ms. Loomer, in posts on X, questioned Mr. Wong's loyalty to the administration because his wife, Candice, had worked at the Justice Department during the Biden and Obama administrations. Ms. Wong was also a career prosecutor and Justice Department official during Mr. Trump's first term and a clerk for Justice Brett M. Kavanaugh.

Ms. Loomer has referred to Ms. Wong, whose father is of Taiwanese descent and worked for what was a British-owned satellite-making company based in Hong Kong, as a "Chinese woman" and alleged that the family was part of a conspiracy. She speculated that Mr. Wong was responsible for adding Mr. Goldberg to the Signal chat "on purpose as part of a foreign opp to embarrass the Trump administration on behalf of China."

Last week, Ms. Loomer singled out an assistant U.S. attorney in Los Angeles, Adam Schleifer, who had unsuccessfully run for Congress as a Democrat in 2020. Less than two hours after she called him a "Trump hater" who should be fired, Mr. Schleifer was terminated.

Since then, she has publicly called for the dismissals of Maria Proestou, a deputy assistant secretary of the Navy; Ivan Kanapathy, the National Security Council director for Asia; Amer Ghalib, the mayor of Hamtramck, Mich., who is Mr. Trump's nominee to be the U.S. ambassador to Kuwait; and Katrina Fotovat, the head of the State Department's Office of Global Women's Issues. In at least one case, Ms. Loomer tagged Mr. Gor, the White House's head of personnel.

In addition, Ms. Loomer said the L.G.B.T.Q. liaison at the Veterans Affairs Department's Center for Minority Veterans should be fired, as well as an unidentified staff member working in the N.S.C.'s intelligence office who she said was transgender and "hates President Trump."

"If you are aware of this person and have their name, please send it to me and I will post their identity," Ms. Loomer wrote on X on Saturday. "The American people deserve to know who this Trans Biden holdover is that is embedded in our intel community."

Last month, she started her own research and vetting firm, called Loomered Strategies, that she said would provide high-level opposition research for hire. The term refers to what she and others call "getting Loomered," which is when she targets someone, either in ambush-style interviews or online. She has also tried to dig up dirt on officials from outside the administration, either because they have gotten in Mr. Trump's way or because she questions their loyalty.

In recent weeks, she has claimed that two federal judges who issued rulings blocking Mr. Trump's efforts to deport noncitizens were compromised because of the activities of their adult children.

Still, at times she has worked against some people Mr. Trump considers allies, including Elon Musk, whom she criticized last year over his support for visas for highly skilled immigrants.

Some of Mr. Trump's far-right allies consider Ms. Loomer a useful tool for attacking common enemies. And the president has mostly admired Ms. Loomer's tactics. Speaking at an event at Mar-a-Lago, he once singled her out in the crowd.

"You don't want to be Loomered," Mr. Trump said. "If you're Loomered, you're in deep trouble. That's the end of your career in a sense. Thanks, Laura."

**Maggie Haberman** is a White House correspondent, reporting on the second, nonconsecutive term of Donald J. Trump.

**Jonathan Swan** is a White House reporter covering the administration of Donald J. Trump.

**Ken Bensinger** covers media and politics for The Times.

A version of this article appears in print on , Section A, Page 1 of the New York edition with the headline: Trump Fires 6 After Meeting With Activist