```
 1                    UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF VIRGINIA
 2                       ALEXANDRIA DIVISION


 3

     TERRY ADIRIM, M.D.,            :
 4                                  :
                   Plaintiff,       :    Civil Action
 5                                  :    No. 1:25-cv-00768-MSN-WBP
                   v.               :
 6                                  :    May 5, 2025
     U.S. CENTRAL INTELLIGENCE      :    11:53 a.m. - 12:33 p.m.
 7   AGENCY, JOHN RATCLIFFE,        :
     IVAN E. RAIKLIN,               :
 8                                  :
                   Defendants,      :
 9                                  :
     ............................:

10

11                  TRANSCRIPT OF MOTION HEARING
          BEFORE THE HONORABLE MICHAEL S. NACHMANOFF,
12                 UNITED STATES DISTRICT JUDGE

13   APPEARANCES:

14   For the Plaintiff:       FLUET & ASSOCIATES, PLLC
                              Kevin Thomas Carroll, Esquire
15                            1751 Pinnacle Drive
                              Suite 1000
16                            Tysons, VA 22102

17   For Defendants          U.S. ATTORNEY'S OFFICE
     U.S. Central            Carolyn M. Wesnousky, AUSA
18   Intelligence Agency     Rebecca Levenson, AUSA
     and John Ratcliffe:     2100 Jamieson Avenue
19                            Alexandria, VA 22315

20   Court Reporter:         Diane Salters, B.S., CSR, RPR, RCR
                              Official Court Reporter
21                            United States District Court
                              401 Courthouse Square
22                            Alexandria, VA 22314
                              Email: Dianesalters.edva@gmail.com
23                            Telephone: (301) 338-8033

24
     Proceedings reported by machine shorthand.  Transcript
25   produced by computer-aided transcription.
```

*Proceedings*

1              THE COURTROOM DEPUTY:  *Adirim v. U.S. Central*

2  *Intelligence Agency, et al.*, Case Number 25-cv-768.  Will the

3  parties please note their appearances for the record.

4              MR. CARROLL:  Kevin Carroll from the Fluet law firm

5  for Dr. Adirim.

6              THE COURT:  Good morning.

7              MR. CARROLL:  Good morning, Your Honor.

8              MS. WESNOUSKY:  Good afternoon, Your Honor.  Assistant

9  United States Attorney Carolyn Wesnousky representing the

10  Government Defendants CIA and Director Ratcliffe.  Along with

11  me at counsel's table is my colleague Rebecca Levenson.

12              THE COURT:  Good morning.

13              All right.  Well, this matter was set down for a

14  hearing after the Court became aware that the case had been

15  filed after-hours on Friday.  The Court entered an order

16  setting the matter for this hearing and entering an

17  administrative stay to maintain the status quo until we could

18  address the underlying issues.  I want to thank the government

19  for being available on such short notice.

20              Have the parties discussed a schedule?  I assume that,

21  perhaps, we won't reach the substance of the matter right now

22  unless the parties wish to do so.  I have not received anything

23  in writing from the government -- and I don't fault them for

24  that; that was not ordered -- but has there been a discussion,

25  Mr. Carroll, with government counsel?

*Proceedings*

1    MR. CARROLL:  No, Your Honor.  I spoke to the chief of

2    the civil division briefly on Friday, and we apologize again

3    for the Friday evening filing.

4    THE COURT:  All right.

5    Ms. Wesnousky, is the government asking for an

6    opportunity to file a written submission?

7    MS. WESNOUSKY:  Your Honor, I am prepared today to

8    discuss Plaintiff's motion in full.  If Your Honor would like

9    something in writing, I'm happy to follow that up as well.

10    THE COURT:  All right.  Well, I will hear some brief

11    argument.  I will tell you that I'm inclined to give the

12    government the opportunity to submit something in writing, but

13    this is the Eastern District of Virginia, and we can move

14    efficiently, so if we can resolve the matter today, we can.  So

15    why don't we have a brief argument and then see whether or not

16    some supplemental briefing would be of assistance to the Court.

17    MS. WESNOUSKY:  Okay.  Thanks, Your Honor.

18    I just want to note at the outset, of course, this is

19    a very unique litigative context.  We're dealing with an

20    application for a temporary restraining order, which is

21    extraordinary relief that is never ordered as of right, and the

22    plaintiff bears the very significant burden, especially here,

23    which is, essentially, an employment case when she can get full

24    relief should she ultimately prevail.  And on the basis of her

25    complaint in her TRO application, she cannot bear this

1  significant burden.

2         So Plaintiff currently has three claims against the

3  government for TRO relief.  Two of these three claims are

4  out-and-out barred as a matter of law.  So she has the Privacy

5  Act claim, the breach of contract claim, and the constitutional

6  due process claim.

7         Plaintiff's Privacy Act claim, she cannot get

8  injunctive relief under as a statutory matter.  The statutory

9  subsection she has brought suit under does not provide for

10  injunctive relief.

11         Plaintiff's breach of contracts claim lies within the

12  exclusive jurisdiction of the Court of Federal Claims because

13  it is a breach of contract claim seeking in excess of $10,000

14  against the United States.

15         And that leaves us with Plaintiff's constitutional due

16  process claim based on her termination.  At bottom, Plaintiff

17  is essentially trying to shoehorn what is a contract claim into

18  a constitutional one, and that's based on, you know,

19  Plaintiff's own allegations, a contract that contains a clause

20  allowing for termination by either party for any reason within

21  30 days.  And that simply doesn't work for a variety of factual

22  legal reasons, which I'm happy to get into here, and those make

23  it a very bad candidate for injunctive relief at the outset.

24         So turning to the standard for preliminary injunction

25  or temporary restraining order -- which is the same --

*Proceedings*

1   Plaintiff, at the very least, cannot establish either clear

2   likelihood of success on the merits or irreparable harm.

3           For success on the merits, there are both factual and

4   legal reasons why Plaintiff cannot succeed.  First, Plaintiff

5   doesn't have a cognizable constitutional claim as a matter of

6   law.  Plaintiff concedes at the outset she has no property

7   interest in her employment and that her employment contract

8   allowed either party to terminate the contract for any reason.

9   Plaintiff is trying to get around this with a couple of

10  theories.  Neither of them really hold any water.

11          First, Plaintiff says that the agency failed to follow

12  its own regulations.  So even assuming that the failure to

13  follow an agency's own regulations is automatically a

14  constitutional due process problem, which it is not, the

15  plaintiff doesn't explain how the CIA failed to follow its own

16  regulations.  In fact --

17          THE COURT:  Well, let me ask you this question -- and

18  I'll ask Mr. Carroll as well -- there was another case

19  involving CIA employees that was before Judge Trenga; I take it

20  the government's view is that none of the regulations at issue

21  that were discussed in the subject of the ongoing litigation

22  and the TRO that was sought and relief that was granted are

23  applicable here?  And, of course, I will ask Mr. Carroll.  I

24  didn't see reference to those in this complaint, but I want to

25  make sure we're all on the same page with regard to whatever

1    differences there may be between the two cases.

2        MS. WESNOUSKY:  Yes, Your Honor.  In fact, I have a

3    copy of the agency's termination regulations that were filed in

4    that case here, if Your Honor wishes to review them, and a copy

5    for Plaintiff's counsel as well.  Those are not the same

6    provisions of that regulation at issue because the plaintiff

7    was a contract attorney -- excuse me -- she was a contract

8    employee.  She is not governed by those same regulations that

9    those plaintiffs were.  So the agency regulations for contract

10    employees allow -- the procedure for that termination is

11    essentially governed by the contract, and that's set forth in

12    the agency's regulation.

13        THE COURT:  And that essentially is the 30 days that

14    was specified and referenced in the complaint, and that would

15    have started on April 4th and run out --

16        MS. WESNOUSKY:  Yes.

17        THE COURT:  -- on the 3rd?

18        MS. WESNOUSKY:  Yes.  And I'm happy to read this for

19    Your Honor right now.  It says, "Procedures for termination

20    prior to expiration of contract.  For contract employees, the

21    term clause of the contract relating to termination of

22    employment prior to the expiration of the contract will govern

23    termination."

24        So, essentially, the procedures that the plaintiff has

25    here, it's whatever is set forth in her contract.

*Proceedings*

1          And the agency regulation also sets forth what the

2     plaintiff's appeal rights are; and in this case, there are

3     none.  Contract employees have no right of appeal, and that's

4     in the agency regulation as well.

5          THE COURT:  Thank you.

6          MS. WESNOUSKY:  So as I was saying, there's no

7     indication here, based on Plaintiff's allegations and the

8     agency's regulations and the contract, that the agency in any

9     way failed to follow its own regulations.

10          Plaintiff's sort of next theory is that she was fired

11     as a result of defamation and, therefore, the reasoning for her

12     termination was unlawful and violated the covenant of good

13     faith and fair dealing.  Plaintiff cites no authority for this

14     proposition whatsoever in her TRO application which, given that

15     it's her burden, is by itself sufficient to defeat that theory.

16     I personally am aware of no case law that states it's unlawful,

17     let alone unconstitutional, for an employer to rely on an

18     untrue statement to fire someone, especially pursuant to a

19     contract --

20          THE COURT:  Well, would it depend on whether or not

21     the employer knew that the statement was untruthful?  In other

22     words, being told something untruthful, acting upon it, and

23     then later discovering that the information was faulty is one

24     potential scenario.  The other is being told something

25     untruthful, knowing it's untruthful, and then relying on it

1    nonetheless to engage in the termination.

2         MS. WESNOUSKY:  I hear the distinction, Your Honor.

3    I'm still struggling to fit that into the legal proposition,

4    which is that that turns it somehow into unlawful.  It makes it

5    a bad reason to fire someone, but that does not make it an

6    unlawful reason to fire someone.  The contract states they can

7    fire her for any reason.  It doesn't state any "good" reason,

8    for example.

9         THE COURT:  So let me ask you this -- and I think I

10   know the answer -- but if we were in a different employment

11   context and you had somebody who had some sort of improper

12   racial animus or animus based on gender, in violation of Title

13   VII or some other statutory duty, and that person then

14   influenced the employer to terminate based on their racial

15   animus or their gender discrimination, would that potentially

16   be a viable claim that it was an unlawful termination even

17   though the contract said they could be fired for any reason?

18        MS. WESNOUSKY:  Absolutely, Your Honor, because that

19   would be a constitutional claim in itself of discrimination and

20   Title VII.

21        THE COURT:  And your argument here is that there are

22   no such allegations by the plaintiff that she was terminated

23   because of a protected category that is protected by law?

24        MS. WESNOUSKY:  Exactly.  There's no allegation that

25   she was fired for a legal reason.  It's that -- Plaintiff's

*Proceedings*

1    theory is that she was fired based on the fact that Ms. Laura

2    Loomer didn't -- asked the president to fire her, for whatever

3    reason; maybe a bad reason, maybe a wrong reason, but not a

4    protected basis.  There's no allegation that there was a

5    protected basis at play.

6         And I think it's important to think this through,

7    which is that accepting Plaintiff's theory here would allow any

8    public employee to invoke the Due Process Clause for a

9    termination simply anytime they disagreed with the rationale

10   for termination regardless of whether or not it was a protected

11   reason.

12        So Plaintiff's third theory is more insinuated at than

13   out and outright pled, is that the CIA fired her and defamed

14   her in the process by leaking to *Breitbart* that she was fired

15   for potentially illegal activity in connection with the COVID

16   vaccine.  The Fourth Circuit does recognize the deprivation of

17   a liberty interest where the government fires an employee and

18   at the same time makes public statements stigmatizing that

19   employee, which sort of, in effect, makes them unemployable.

20   So the idea there is the employee is losing a liberty interest

21   in future employment because a public statement by the

22   government in conjunction with their firing about their

23   character makes them unhireable in the future.  That's known as

24   "stigma-plus" under a long line of Fourth Circuit cases,

25   notably *Ridpath v. Board of Governors.*  But there are many

1  others within the Fourth Circuit that discuss this type of

2  liberty interest, but that's not this case, and the plaintiff

3  doesn't actually frame her claim that way.

4          Also, if you look at what Plaintiff's actual

5  allegations are, it's premised on this single *Breitbart*

6  article.  And I don't know if Your Honor has actually had a

7  chance to read that article -- it wasn't attached to

8  Plaintiff's complaint -- but if you look at the actual language

9  of the article, all it says is, "Terry Adirim, a senior Central

10  Intelligence Agency official and former senior defense

11  official who played a pivotal and potentially illegal role in

12  the Biden Administration's military vaccine mandate, was

13  recently fired from the agency, a source has exclusively

14  revealed to *Breitbart News*."

15          So the theory here is that the source, I guess was

16  from the CIA, they told *Breitbart* not only that she was fired,

17  but that her activity with the vaccine mandate was potentially

18  illegal.  I don't read the article that way.  To me, it seems

19  like all the source said was this woman was fired, and then

20  *Breitbart* goes on to make what is actually a fairly nuanced

21  legal article about the memorandum that Dr. Adirim issued

22  allowing sort of -- requiring servicemembers to take

23  alternative vaccines as opposed to the FDA-approved vaccine.

24  So there's no actual overt, direct government statement that

25  the plaintiff had any sort of serious character flaw that would

*Proceedings*

1    lead to her stigmatization, and that's what these Fourth

2    Circuit cases require in order to create a stigma-plus claim.

3    I'm not seeing here that this single sentence in the *Breitbart*

4    article is some type of public disclosure by the CIA that

5    satisfies the public disclosure standard required by the type

6    of claim.  In fact, there's no indication who the source is,

7    let alone that the source revealed a reason for Dr. Adirim's

8    firing.  So those are the legal reasons why Plaintiff doesn't

9    have any type of constitutional due process claim.

10           But second to that, there are a series of factual

11    reasons why Plaintiff is unlikely to prevail on her claim, and

12    that is because the underlying factual theory that the CIA

13    fired her because Ivan Raiklin told Laura Loomer to ask

14    President Trump to do so is incorrect.  The CIA's decision to

15    terminate Dr. Adirim's contract had nothing to do with Laura

16    Loomer, with Ivan Raiklin, or with Dr. Adirim's role at the DoD

17    related to the COVID vaccines.  I was able to speak with the

18    agency several times between when we received the complaint and

19    this morning, and what I've learned from the agency -- you

20    know, this is, of course, preliminary information, which is why

21    we weren't able to submit anything in writing to Your Honor

22    ahead of time, for which I apologize -- is that the CIA

23    actually began reviewing the circumstances of Dr. Adirim's

24    tenure and her onboarding well before this alleged April 2nd

25    White House meeting with Laura Loomer, and that review began

1    weeks before the April 2nd meeting and didn't have anything to

2    do, again, with Loomer, Raiklin, or the COVID vaccinations.

3    Instead, that review indicated, among other things, that

4    Dr. Adirim was brought on board at the CIA in a leadership

5    position and began her role in the final weeks of the outgoing

6    administration.  That raised concerns regarding whether

7    Dr. Adirim was the right officer for this important leadership

8    position that she occupied.

9         The review also included additional concerns regarding

10   Dr. Adirim, including multiple complaints by different CIA

11   officers of inappropriate conduct by Dr. Adirim during her

12   short tenure at the CIA.  The CIA hasn't fully adjudicated or,

13   in fact, has not publicly disclosed these complaints by other

14   officers, and I'm doing so here now only in response to

15   Plaintiff's accusations of ulterior motives for the

16   government's termination of her contract.  The combinations of

17   these concerns regarding Dr. Adirim's onboarding and the

18   multiple complaints regarding her conduct only months into her

19   new position led the CIA to exercise the termination provision

20   of her contract.  That decision was communicated to Dr. Adirim

21   on April 4th, at which point she was put on administrative

22   leave for 30 days.  The CIA is confident that the decision had

23   no connection to, again, Laura Loomer, her White House visit,

24   any tweets or public statements by Ms. Loomer or Mr. Raiklin,

25   or Dr. Adirim's role with respect to DoD's COVID vaccine

1    policy; and given that, it's not plausible to believe that

2    Ms. Loomer asked President Trump to fire Dr. Adirim other than

3    the timing because, as Plaintiff notes, Ms. Loomer took public

4    credit for these other firings that allegedly occurred as a

5    result of her White House visit, was very publicly and vocally

6    proud of those firings, but has never, according to Plaintiff,

7    mentioned her own firing following the meeting.  So those are

8    the reasons why Plaintiff's claim is unlikely to succeed on the

9    merits.

10          Turning to the irreparable harm prong, the Supreme

11   Court is very clear that injunctive relief is not appropriate

12   for the pending termination of a government employee.  The

13   *Sampson* case from the Supreme Court sets forth there's a higher

14   standard for irreparable injury in those circumstances and that

15   loss of income and damage to reputation is not sufficient to

16   meet that standard.  In fact, the *Sampson* court states that

17   injuries that can later be remedied by monetary damages are not

18   appropriate for injunctive relief.  And that is all we're

19   looking at here.  Plaintiff's injuries, which are essentially

20   the loss of her position and retirement benefits, can later be

21   remedied by monetary damages to the extent that Plaintiff is

22   successful in her claim, and the harm to her reputation is in

23   any case not actually irreparable future harm because to the

24   extent that has occurred, the cat's sort of already out of the

25   bag; the article has been published.

1      And then I believe Plaintiff relies on a single case

2  for the proposition that irreparable harm here is available,

3  and that's the *Roe* case from the Fourth Circuit.  The *Roe* case

4  was a very specific context where the Fourth Circuit found that

5  servicemembers who were HIV positive and were about to be

6  discharged from the military solely due to that status were

7  entitled to injunctive relief because of very specific

8  circumstances, which were that the injury of their discharge

9  was compounded by the stigma of people living with HIV and the

10  fact that a discharged servicemember would have to likely

11  reveal their underlying HIV condition if discharged to future

12  employers, which is something that could not later be remedied.

13  And that's just simply not the case in this instance.  The

14  plaintiff here can seek remedy for the injuries she has

15  alleged; and, in fact, is doing so by pursuing, among other

16  things, defamation claims against the individual defendants.

17  And there's no reason to suggest, nor does she allege, that she

18  would have to reveal the *Breitbart* article or its supposed

19  reason for her termination in order to seek future employment.

20      THE COURT:  Thank you very much.

21      Mr. Carroll.

22      MR. CARROLL:  Thank you, Your Honor.  Your Honor, good

23  morning and may it please the Court.  Kevin Carroll from the

24  Fluet firm for Dr. Adirim.

25      Your Honor, obviously, we disagree with the

Proceedings

 1  government's analysis of the case here.  Going through the four

 2  requirements to get injunctive relief, as far as success on the

 3  merits, I understand counsel's point that the Privacy Act

 4  itself doesn't give somebody grounds for injunctive relief

 5  alone, but the agency has very clearly violated the Privacy

 6  Act.  The fact that Dr. Adirim worked for the CIA, it is

 7  contained in a work record, it's private, and it was somehow

 8  shared with one of the other defendants in this case, Colonel

 9  Raiklin, as was the fact of her termination.  So, clearly,

10  someone at the CIA violated the Privacy Act by leaking both her

11  hiring and her firing to an outside party.

12          THE COURT:  Help me understand the injunctive relief

13  part of it, though.  I understand what you're saying about

14  believing that you have a claim that you wish to pursue.  How

15  does that relate to needing injunctive relief or otherwise

16  pursuing that in the regular course of litigation, and if you

17  succeed receiving relief through --

18      (Crosstalk.)

19          MR. CARROLL:  Sure, Your Honor.  The crux of it is the

20  Fifth Amendment due process claim because the property interest

21  that Dr. Adirim has in not suffering, as counsel correctly put

22  it, stigma-plus from being fired pursuant to a statement that's

23  defamatory; not only false and defamatory, but the government

24  knows it's false and defamatory.  There were statements made by

25  another one of the defendants in this case that the plaintiff

1    was involved in genocide, in homicide, and so on and so forth

2    for her role in the coronavirus vaccination program, and we

3    believe -- and I'm happy to get into detail on this -- that

4    Dr. Adirim was fired from CIA because these statements were

5    passed on to the president by Dr. [*sic*] Loomer.  You can't

6    unring the bell on being fired with stigma-plus, and that's why

7    we mention the Privacy Act as well.  Somebody leaked the fact

8    that she was being fired to someone who had been making these

9    public claims that she was involved in, again, homicide,

10   genocide, the worst kind of defamatory, per se, activities.

11        I think the *Roe* case is spot on.  It's an inconvenient

12   case for the government, but I think Dr. Adirim's case is even

13   stronger than that of plaintiffs in *Roe v. Department of*

14   *Defense*.  If somebody applied to my law firm or the Department

15   of Justice or your chambers and said, Hey, I just medically got

16   out of the military because I'm HIV, but can I have a job, we

17   wouldn't hold that against them, right?  But if somebody said,

18   you know, I'm applying for a job with chambers, with my law

19   firm, with DOJ because I was allegedly involved in illegal

20   activity, including homicide, of course, you wouldn't hire

21   them.  So I think it's even more on point.  The case is on

22   point, and it's even more severe than the harm suffered by the

23   airmen in *Roe* for the stigma-plus.

24        THE COURT:  Let me just ask, to try and unpack this:

25   I understand your argument with regard to allegedly defamatory

1   statements against the other defendants that aren't subject to

2   the TRO, but where in the complaint is the allegation that the

3   government was adopting the defamatory statements beyond the

4   connection that you are alleging is being made inferentially?

5           MR. CARROLL:  Beyond the leak, the tweet immediately

6   after the *Breitbart* article came out by the president's son.

7   And the president's son, let's face it, has a large influential

8   role in this administration, so within moments of the *Breitbart*

9   article coming out, Donald Trump, Jr., tweets a clap emoji

10  about Dr. Adirim being fired pursuant to the defamatory

11  statements made by Defendant Raiklin and others.  I think

12  that's the government --

13          As far as breach -- I mean, as far as getting a

14  preliminary injunction on breach, I know I probably wouldn't

15  get that, but I think that any --

16          THE COURT:  Let me ask you, and I realize it's a

17  little unfair to the parties and to the Court because it hasn't

18  been briefed in advance, but do you have a response to the

19  argument that the breach of contract is not properly brought

20  here, that it needs to be brought in the Court of Claims?

21          MR. CARROLL:  I understand the jurisdictional point,

22  but I think -- and, again, we got retained on Tuesday, we had

23  to file papers on Friday -- I think we wanted to mention the

24  three illegal things we think the government is doing here:

25  the violation of the Privacy Act, the Fifth Amendment, due

 1    process and liberty interest claim, and the breach of contract

 2    claim.

 3            And to your point -- and this was a point that was

 4    made by Judge Trenga in the other CIA case -- you couldn't --

 5    you know, no matter what kind of regulatory authority the CIA

 6    director may claim or statutory authority he may claim, he

 7    couldn't, you know, fire every African American member of the

 8    CIA or something like that if he wanted to.  And, similarly, I

 9    think here he can't do it pursuant to a defamatory statement

10    that he knows to be false.  And I think that saying that you

11    can fire somebody for any reason reasonably assumes we're

12    talking about legal reasons.

13            THE COURT:  And this may lead us to, shortly, a

14    conclusion that we need a little bit further briefing on this

15    issue.  I don't want to be precipitous in reaching any

16    conclusions.  But I want to understand, first, where in the

17    complaint there is an allegation that the director knew that

18    these statements were false; and then, secondly, what legal

19    authority there is that relying on defamatory statements is

20    unlawful in the same way adopting racial discrimination or

21    racial animus would be, as conceded by the government and as

22    you've articulated.

23            MR. CARROLL:  Your Honor, for the first question, as

24    to the evidence that Director Ratcliffe knew and this is why he

25    did this, we're just going by the TikTok [*sic*].  You have

1    statements by Defendant Raiklin saying that the plaintiff is

2    involved in homicide and so forth.  You have Laura Loomer meet

3    with the President of the United States.  Hours afterwords, you

4    have Defendant Raiklin tweet [as said]:  I greatly respect

5    Laura Loomer.  The next day, a series of national security

6    officials, very senior national security officials -- the

7    director of the National Security Agency, a bunch of the senior

8    National Security Council staff -- all get fired.  Hours later,

9    Laura Loomer claims credit for that.  The next day, the

10   president admits that he discussed the terminations with Laura

11   Loomer.  And then the next day -- or that same day that the

12   president said that, out of the blue, the plaintiff is fired;

13   and when she asked her supervisors twice, Why am I being fired,

14   the supervisors say they have no idea.

15          My mother said I was born at night, but not last

16   night.  I think there's a connection between those things

17   happening, and I think discovery would show that, certainly,

18   word was passed from the White House to the CIA to terminate

19   Dr. Adirim.

20          Your Honor, as far as irreparable harm, again, I agree

21   with counsel that as far as the retirement benefits, that could

22   be taken care of in post-termination relief, but not the

23   stigma-plus.  Being fired, you know, pursuant to these public

24   statements -- again, amplified by the son of the president of

25   the United States -- that the plaintiff was involved in

1   genocide is irreparable harm.

2          The balance of the hardships here is wildly

3   unbalanced.  The hardship to the government is paying three

4   more weeks or something like that of salary to the plaintiff,

5   whereas in addition to the stigma-plus, the damage to the

6   plaintiff is retirement benefits, you know, that she's worked

7   for for very many years in the federal government, as many of

8   us have.

9          And then, fourth, as to the public interest, you know,

10  the plaintiff served in a series of increasingly responsible

11  positions with Department of Health and Human Services,

12  Department of Veteran's Affairs, Department of Defense, up to

13  the Assistant Secretary of Defense level, and now in the senior

14  intelligence service role at CIA.  I think there's a great

15  public interest in her continued service, and absolutely no

16  harm would come to the government from her staying on

17  administrative leave until she hits retirement in just a few

18  weeks.

19         Your Honor, again -- and to answer your other

20  question, as far as the case law saying that you can't fire

21  someone pursuant to a defamatory statement, that leads to a

22  Fifth Amendment liberty interest or due process interest claim.

23  Again, with apologies, we had to put these papers together in

24  pretty short order, so I didn't have a case citation for that.

25  I'm the counsel in that other CIA case, and that's what I took

1   Judge Trenga's opinion from the bench to say.  He hasn't come

2   out with his written memorandum and order yet.  But my

3   understanding of what the Court said in that case was,

4   terminating all of these people who were involved in some

5   degree in diversity programs at CIA pursuant to a presidential

6   statement that they were involved in illegal activity was the

7   sort of stigma-plus thing that the Fourth Circuit found in

8   *Roe v. Department of Defense*, could lead to a Fifth Amendment

9   violation.  And I think we're looking at the same thing here.

10  I guess I would cite to the transcript of his opinion from the

11  bench there, not being able to cite it to the Federal Reporter

12  yet.

13          THE COURT:  Thank you.

14          I will hear very briefly from you.

15          MS. WESNOUSKY:  I just wanted to respond, again

16  briefly, to some of the points Mr. Carroll made.  I'm a little

17  frustrated to be before the Court at this early stage where the

18  plaintiff is asking for relief and admitting that, you know,

19  this complaint was rushed, only put together in a few days, and

20  that they don't necessarily have all the information yet but

21  they think it will come up through discovery.  I mean, that's

22  not the burden -- the standard he needs to reach to get the

23  extraordinary remedy of injunctive relief.  He needs to make a

24  clear showing now today that he is entitled to the relief he's

25  seeking.

1      And when he's talking about the president's son's

2  tweet was a tweet to this *Breitbart* article, it makes no

3  mention of Mr. Raiklin's comments.  It doesn't mention the word

4  "genocide"; it doesn't mention the word "mass murderer."

5  Literally, all it says is she played a pivotal and potentially

6  illegal role in the Biden Administration's military vaccine

7  mandate.

8      The alleged defamation that Mr. Raiklin committed,

9  that occurred months and months before this.  That was, like,

10  October 2024.  He went on the Roseann Barr podcast and spoke

11  about his opinions of Dr. Adirim and her conduct.  There's no

12  link, really, between Mr. Raiklin's private views on Dr. Adirim

13  and Ms. Loomer, and there's no real connection in the complaint

14  between Ms. Loomer and Mr. Raiklin other than the fact --

15      THE COURT:  What day was Ms. Loomer's meeting with the

16  president?

17      MS. WESNOUSKY:  That was April 2, 2025.

18      THE COURT:  And Dr. Adirim is alleged to have been

19  told she was being terminated on April 4th; is that correct?

20      MS. WESNOUSKY:  Yes.  I fully see that there is some,

21  unfortunately, coincidental timing, but I think at this stage,

22  that alone can't be relied on.

23      And, again, when we're talking about stigma-plus,

24  we're talking about defamation by the government, by the CIA

25  making a clear public statement saying that Dr. Adirim was

1    fired because she engaged in potentially illegal activity and

2    is a war criminal.  That's not what this article says.  It's

3    not even close to what this article says.  This says a source

4    said something that included that she was fired.

5         THE COURT:  Let me be clear, because you asked the

6    Court a question earlier about whether the Court had read the

7    *Breitbart* article:  Now, the *Breitbart* article is not attached

8    to the complaint, correct?

9         MS. WESNOUSKY:  It is not.

10        THE COURT:  It is referenced in the complaint.

11        MS. WESNOUSKY:  Yes, which, I think, in itself is

12   telling because there's nothing there.

13        I think that's all I have, unless Your Honor has any

14   other questions.

15        MR. CARROLL:  Just two points, Your Honor.

16        The reason I didn't attach the article as an exhibit

17   to the complaint is that the defamatory statement in the

18   article is in the tweet by the president's son and other tweets

19   saying that Dr. Adirim was fired for potentially illegal

20   activity.  Now, is potentially illegal activity as severe a

21   statement as saying that somebody is involved in homicide?  No.

22   But I don't think I would want to apply to the U.S. Attorney's

23   Office or an AUSA wouldn't want to apply to a law firm saying,

24   Yeah, I got fired from my last job for potentially illegal

25   activity.  I mean, it's pretty serious.

1      THE COURT:  I understand.  Anything else?

2      MR. CARROLL:  Yes.  And as far as what the connections

3   are between Laura Loomer and Ivan Raiklin, as was said in the

4   complaint, they went on tour together, so they're pretty

5   clearly close associates.  They were on some speaking tour

6   together.

7      And, finally, Your Honor -- we can address this

8   after -- I have to put on the record the extraordinary tweets

9   that were made by one of the defendants -- not the government,

10  obviously -- this weekend about my client, about this court.  I

11  mean, just some really appalling, shocking language, you know,

12  calling for violence against the plaintiff, tweets saying that

13  she needed to receive the maximum punishment under the law.

14  Mr. Raiklin has repeatedly accused her of treason, so that's,

15  obviously, death.  He called for the castration of the deep

16  state.  I guess that's me.  He tweeted out your Wiki bio and, I

17  believe, photo, the date and time and place of this hearing.

18  That last part is fine.  Again, this is just this weekend,

19  so that was (indecipherable) to the filing of the complaint.

20  Called for the plaintiff to receive the highest form of

21  punishment; and, again, this is in the context of him accusing

22  her of treason.  He asked, "Why is this obese, genocidal,

23  treasonous monster still roaming the streets?" -- copying the

24  U.S. Attorney for this jurisdiction on the tweet -- suggesting

25  that she be livestreamed rated by the FBI, and saying that she

1    should receive a million forcible vaccinations, which would

2    obviously result in death.  You'd die if you took a million

3    aspirin.

4          So I just want to put on the record that Defendant

5    Raiklin, who's in the court today, is a member of the bar, is a

6    former commissioned officer in the United States Army.  We'll

7    take this up with the bar.  We'll take this up with his

8    employer.  He's on the board of a charitable foundation.  But I

9    just wanted to put it on the record in case the marshals wanted

10   to have a word with him.  I knew when I clerked, if a defendant

11   in a case was calling for the death of a party-opponent, I

12   think the marshals service might have something to say about

13   it.

14         THE COURT:  Just to be clear, everything that you've

15   just shared with the Court is not contained in the complaint,

16   correct?

17         MR. CARROLL:  No.  That was the defendant's response

18   to the complaint this weekend, by tweeting, including, I

19   believe, through this morning.

20         THE COURT:  I understand.

21         MR. CARROLL:  Thank you, Your Honor.

22         THE COURT:  Well, this matter comes before the Court

23   on Plaintiff's TRO.  And, again, I thank the government for

24   appearing today and being prepared on short notice.  And,

25   frankly, I did not anticipate we would have a substantive

1    discussion because I wanted to be sure to give both sides a

2    fair opportunity to be heard.  I'm not prepared to rule right

3    now.  I think there are enough things that the Court needs to

4    think about that it would benefit all of the parties and the

5    Court to set another hearing and to give the government an

6    opportunity to submit an opposition in writing and the

7    plaintiff to submit a reply.  Both parties -- and it's not a

8    criticism -- have referenced matters that were unavailable to

9    the Court either because they occurred after the complaint was

10   filed or because the government has only recently been able to

11   speak with the agency about the underlying facts.

12          This is a TRO.  We can address whether or not it's

13   converted to a preliminary injunction hearing now that the

14   parties are joined, but the Court certainly can consider facts

15   beyond the complaint for purposes of the TRO when appropriate,

16   and so to the extent the government wishes to file a response

17   that includes any affidavits or factual information rather than

18   simply taking it through counsel's proffer, I want to give the

19   government the opportunity to do so.

20          Likewise, Mr. Carroll, if you feel there are factual

21   matters that have arisen or that you think are relevant to the

22   issue of the extraordinary relief that you're seeking at this

23   time, I will give you a chance to submit that as well.

24          So let's set this matter for Friday at 10:00 p.m.

25   [*sic*].  It does not give anyone very much time, but I do want

1    to be prompt in moving this forward.

2            Is there an objection to Friday?

3            MS. WESNOUSKY:  Do you mean a.m., Your Honor?

4            THE COURT:  Yes.  Did I say "p.m."?  I meant

5    10:00 a.m.  We'll put it on the regular civil docket at

6    10:00 a.m.

7            I'm going to ask the government to submit its written

8    opposition tomorrow by noon.  I realize that's a very short

9    amount of time, but I will say that I have listened carefully

10   to the government's argument.  You do not need to repeat

11   everything that you have put in there; however, I would like

12   something a little bit more in detail on the issue of the Court

13   of Claims and the transfer of this matter, the government's

14   position on whether or not that can be segregated out and sent

15   to the Court of Claims, or whether it must be, or whether that

16   affects the remaining part of the case; and, of course,

17   Mr. Carroll, you can respond to that.

18           To the extent anything else needs to be addressed with

19   regard to injunctive relief under the Privacy Act, although

20   that issue has been discussed now, certainly, if there are any

21   statutory references the government wishes to include, I would

22   urge you to do that.

23           And then, finally, the issue regarding factual

24   information about whatever you think the Court should know

25   about when the CIA began its process of deciding to terminate

1    the plaintiff in this case would be helpful for the Court to

2    see.

3              And, likewise, Mr. Carroll, I will let you file a

4    reply by noon the following day, and that way, I will have a

5    little bit of an opportunity to review this before our argument

6    on Friday morning.

7              So I will expect one brief tomorrow at noon from the

8    government and a reply on Wednesday, and then I will have

9    Thursday to review it, and we'll come back and resume this

10   matter.  And I won't expect that we'll start at the beginning;

11   we'll just simply pick up to see whether there's any additional

12   argument that needs to be made before the Court rules.  My

13   prior ruling will remain in effect with regard to the

14   plaintiff's position until the resolution of the TRO.

15             Is there anything else that I need to address with

16   regard to this matter today?  Nothing from you, Mr. Carroll?

17             MR. CARROLL:  No, Your Honor.

18             THE COURT:  And nothing from the government?

19             MS. WESNOUSKY:  No, Your Honor.

20             THE COURT:  Thank you very much.  Court will be in

21   recess.

22                      *     *     *     *     *

23

24

25

1          <u>CERTIFICATE OF REPORTER</u>

2              I, Diane Salters, hereby certify that the foregoing

3      transcript is a true and accurate record of the stenographic

4      proceedings in this matter.

5                                   /s/ Diane Salters

6                          _____

                                    Diane Salters, CSR, RCR, RPR
7                                   Official Court Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25