**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| TERRY ADIRIM, M.D.,       ) | |
|       ) | |
| Plaintiff,       ) | |
|       ) | Case No. 25-cv-00768-MSN-WBP |
| v.       ) | |
|       ) | |
| U.S. CENTRAL INTELLIGENCE       ) | |
| AGENCY; *et al.*       ) | |
|       ) | |
| Defendants.       ) | |

**PLAINTIFF TERRY ADIRIM'S BRIEF IN OPPOSITION TO DEFENDANT**
**IVAN RAIKLIN'S MOTION TO DISMISS FIRST AMENDED COMPLAINT**

**INTRODUCTION**

This case arises from Defendants' campaign to harm Plaintiff Dr. Terry Adirim ("Plaintiff" or "Dr. Adirim"), based on political bias and personal animus. Defendant Ivan Raiklin ("Defendant "Raiklin" or "Raiklin"), a conservative firebrand, makes a livelihood out of spreading lies about political and cultural opponents. Defendant Raiklin's defamatory falsehoods targeted Dr. Adirim both by name and by including her on Raiklin's "Deep State Target List," which identifies scientists, medical professionals, civil servants, and others who Raiklin seeks to intimidate, imprison, and even execute. The specific claims in this case arise from Defendant Raiklin's appearance on Roseanne Barr's podcast in October 2024 and his subsequently claimed unlawful receipt of Dr. Adirim's private direct messages stored in her password-protected X account.

Before being swept up in Raiklin's culture war, Dr. Adirim was a career medical professional and civil servant. With over 25 years of experience in pediatric emergency medicine, Dr. Adirim is a skilled practitioner, prolific academic, and seasoned policy advisor. Following

Raiklin's malicious and public degradation, which included allegations of criminal conduct, Dr. Adirim lost her employment as the senior medical practitioner at the Central Intelligence Agency ("Defendant CIA" or "CIA"). She also suffered reputational harm and struggles to find new employment.

The defamation claims arise from three statements Defendant Raiklin made during his appearance on Barr's podcast. Defendant Raiklin identified Dr. Adirim by name and stated that she "signed the memo institutionalizing the illegal vax mandate on the DOD;" that she is "criminally liable and [will] face consequences for genocide and for mutilation;" and that she will "be convicted of genocide and mass mutilation at the very least." Dkt. 45 ¶78. Defendant Raiklin also alluded to his possession of Dr. Adirim's private messages from her X account and his willingness to use them against her.

Dr. Adirim seeks redress for the professional, reputational, and emotional harm she suffered as a result of Raiklin's campaign to malign her.

## LEGAL STANDARD

When deciding a motion to dismiss, a court draws all reasonable inferences in favor of the plaintiff. *See Nemet Chevrolet, Ltd. v. Consumeraffairs.com*, Inc., 591 F.3d 250, 253 (4th Cir. 2009). A motion to dismiss should only be granted if after accepting all well-pleaded allegations as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, "it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999).

## ARGUMENT

### I.    Defendant Raiklin's False Claims Are Not Constitutionally Protected.

Defendant Raiklin contends that his criminal accusations against Dr. Adirim are protected opinions. But false allegations that Dr. Adirim broke the law at the Department of Defense and

committed genocide, homicide, and mutilation are disprovable statements of fact, not mere opinion or hyperbole. And Defendant Raiklin's statements are not protected analyses where they knowingly or recklessly relied on factual assertions that are incorrect, incomplete and not fully disclosed.

### a.    Defendant Raiklin's statements are factual assertions and not protected opinions.

There is no "wholesale defamation exemption for anything that might be labeled 'opinion,'" because "expressions of 'opinion' may often imply an assertion of objective fact." *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 18-21 (1990) (stating that the connotation that plaintiff "committed perjury is sufficiently factual to be susceptible of being proved true or false"); *see also WJLA-TV v. Levin*, 265 Va. 140, 156 (2002). The guiding analysis is whether a statement contained or implied a provably false statement of fact. *See, e.g.*, *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1093 (4th Cir. 1993) ("Though opinion *per se* is not immune from a suit for libel, a statement is not actionable unless it asserts a provably false fact or factual connotation"). Similarly, statements "characterized as rhetorical hyperbole are those from which 'no reasonable inference could be drawn that the individual identified in the statements, as a matter of fact, engaged in the conduct described.'" *Cashion v. Smith*, 286 Va. 327, 339-40 (2013) (quoting *Yeagle v. Collegiate Times*, 255 Va. 293, 296 (1998)).

It is well established in Virginia that accusing doctors of criminal acts or malpractice constitutes objectively verifiable statements of fact for purposes of defamation per se. *E.g.*, *Levin*, 264 Va. at 157 (allegations that a doctor sexually assaulted patients are not protected opinion); *Goulmamine v. CVS Pharmacy, Inc.*, 138 F. Supp. 3d 652 (E.D. Va. 2015) (statements regarding medical doctor causing overdoses, and that doctor committed misconduct worthy of losing his license to practice medicine or dispense controlled substances are sufficient for doctor to state

defamation per se claims against pharmacy); *Carwile v. Richmond Newspapers, Inc.*, 196 Va. 1, 7 (1954) (defamatory words that prejudice a person in his or her profession or trade are actionable as defamation per se).

Virginia law also recognizes, as defamatory per se, statements which "impute to a person a criminal offense of moral turpitude for which the party may be indicted and punished." *Mann v. Heckler & Koch Defense, Inc.*, 639 F. Supp. 2d 619, 635 (E.D. Va. 2009) (citing *Wells v. Liddy*, 186 F.3d 505, 522 (4th Cir. 1999)); *Parr v. Commonwealth*, 96 S.E.2d 160, 163 (Va. 1957) (defining a crime of moral turpitude as "an act of baseness, vileness, or depravity in the private and social duties which a man owes to his fellow man, or to society in general, contrary to the accepted and customary rule of right and duty between man and man"); *Sepmoree v. Bio-Medical Applications of Va., Inc.*, 2014 WL 4444435 at *6, n.9 (E.D. Va. Sept. 8, 2014) (including homicide as crime of moral turpitude).

The Amended Complaint identifies three of Defendant Raiklin's statements in support of Plaintiff's claim of defamation per se: (1) his claim that Dr. Adirim violated the law (and her ethical and professional duties as a doctor) by signing "the memo institutionalizing the illegal vax mandate at the DOD;" (2) his claim that Dr. Adirim is criminally liable and will "face consequences for genocide and for mutilation;" and (3) his claim that Dr. Adirim will "be convicted of genocide and mass mutilation at the very least." Dkt. 45 ¶78. Far from Defendant Raiklin's mere belief or opinion framed as such, these are falsifiable statements of fact emanating from an attorney, retired Green Beret, and former field grade officer in the United States Army, who holds himself out as an authoritative voice on law, politics, and policy. Dkt. 45 ¶62 and Dkt. 45-1. Indeed, Defendant Raiklin holds himself out as an authority on constitutional law. Dkt. 45-1 at 409.

*Levin*'s treatment of sexual assault allegations against a doctor is instructive. *See* 264 Va. at 147-48. A news station "referred to its 'undercover' investigation 'expos[ing] the intimate violation of women at the hands of their doctor,' which amounted to 'sexual assault,' and repeatedly referred to the unnamed subject of the news story as 'the 'Dirty Doc'' and ''X–Rated Doctor.''" *Id.* These statements, accompanied by accusations that Dr. Levin's "treatment modality for piriformis syndrome was not medically appropriate," met the elements of defamation and supported an award of presumed damages. *Id.* at 156-157. The court reasoned that it is "manifestly apparent" that the defamatory statements posed a substantial danger to the doctor's "reputation as a physician." *Id.* at 154.

Similarly here, Defendant Raiklin's allegations that Dr. Adirim committed crimes with established legal meanings go to the core of her professional competency and ethics. Dkt. 45 at ¶80. Not only are homicide, genocide, and mutilation crimes of moral turpitude for purposes of defamation per se, but such acts also constitute grave violations of doctors' duty of care and commitment to abstain from harming patients as set forth in the Hippocratic oath. Such allegations prejudice Dr. Adirim in her trade as a medical professional and, in fact, prevent her from obtaining employment following her termination at Defendant CIA. Dkt. 45 at ¶82.

The two cases Defendant Raiklin cites do not support his position that any reasonable listener would conclude from the context that his statements are mere opinions. Dkt. 47 at 5. First, in *Chaves v. Johnson*, 230 Va. 112 (1985), a competitor wrote a letter alleging that the plaintiff architect lacked experience and charged excessive fees. *Id.* at 118. The court found the charge of inexperience to be a non-defamatory reality of gaining proficiency, stating, "Many physicians, it is to be hoped, cure their first patients." *Id.* That statement is also relative insofar as it depends "largely upon the speaker's viewpoint." *Id.* at 119. The court reasoned, "A corporal might seem

inexperienced to a sergeant, but not to a private.  The relative nature of such opinions is obvious to anyone who hears them." *Id.*  Similarly, the court assessed the accusation of excessive fees to be viewpoint-dependent and noted, "In the world of commercial competition, statements by competitors that they can undersell others fall on prospective customers' ears like repetitive drumbeats." *Id.*  Similarly, in *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087 (4th Cir. 1993), the court found that the phrase "hefty mark-up" is too subjective to sustain a defamatory implication.

There is nothing relative about Defendant Raiklin's criminal accusations against Dr. Adirim.  It is not a fact of life, as with the accumulation of experience, that all doctors at one time or another in their careers commit crimes of homicide and mutilation.  Further, because Defendant Raiklin is not any kind of commercial competitor to Dr. Adirim, his words do not occupy the same societal din as the puffery in *Chapin*.  It is possible that some of Defendant Raiklin's wildest accusations, like that of treason, are adulterated by the unfortunate contemporary chatter of political hyperbole.  But his specific criminal allegations—accompanied by posts calling for "Nuremberg 2.0" and identifying Dr. Adirim by name—stand apart.  Dkt. 45 ¶¶55-56.

Defendant Raiklin's statements are falsifiable assertions of fact and do not constitute constitutionally protected opinions.  The well-pleaded facts concerning the circumstances of his remarks reflect the earnest nature of his statements, which Plaintiff anticipates discovery will further reveal.

   **b.    Defendant Raiklin's statements relied on assertions of fact that are incorrect, incomplete, and not fully disclosed.**

Defendant Raiklin's position that his statements are protected analyses of disclosed facts fails for two reasons.  First, Defendant Raiklin did not actually provide facts in support of his so-called analysis.  And second, Defendant Raiklin cannot immunize his "analysis" when he knowingly or recklessly relied on incorrect and incomplete facts.

Opinions that might otherwise be defamatory are protected when the speaker fully discloses the factual basis for the opinion. *Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180, 185 (4th Cir. 1998) (opinions fully disclosing their factual bases constitute a subjective view and are not actionable); *see also Phantom Touring, Inc. v. Affiliated Publications*, 953 F.2d 724, 730 (1st Cir. 1992) (where "all sides of the issue, as well as the rationale for [the speaker's] view, were exposed, the assertion of deceit reasonably could be understood only as [the speaker's] personal conclusion about the information presented"); *Standing Comm. on Discipline of the United States Dist. Court v. Yagman*, 55 F.3d 1430, 1439 (9th Cir. 1995) ("A statement of opinions on fully disclosed facts can be punished only if the stated facts are themselves false and demeaning").

Again, a closer review of the facts in the cases on which Defendant's position relies is instructive. In *Schaecher v. Bouffault*, 290 Va. 83, 100-01 (2015), the court noted the careful analysis of specific documents that accompanied the offending emails:

> The first truth-related email [] relays information pertaining to prior deferred kennel applications from Loudoun County, provides a link to 3 Dog Farm's website, and concludes based on the relayed information that "It would appear that Mrs. Schaecher was not totally truthful...." in stating that the family did not currently have a commercial kennel. The final email [] describes to Brandon Stidham and Jesse Russell apparent discrepancies between the Planning Commission's initial understanding of the use of Schaecher's property and Schaecher's current characterization, states that Schaecher has twice stated that Russell is lying, encourages that all communication with her be in writing only, and states "I firmly believe that Gina is lying and manipulating facts to her benefit...."

In his podcast appearance, Defendant Raiklin made no attempt to marshal original documents, data, scientific literature, or other factual support for his claim. Unlike the *Schaecher* emails, which scrutinized the language of original documents and plaintiff's own statements, *id.*, Defendant Raiklin's statements here are unaccompanied by external support. Therefore, they are not "analysis" at all. If Defendant Raiklin analyzed his view of supposed "facts," those facts are undisclosed to the listener. Further, *Schaecher* noted that the two individuals who received the

allegedly defamatory emails actually held "an equal or higher degree of knowledge of the situation" than the sender.  *Id.* at 105-06.  The same is not true of the public here, who likely ascribed superior knowledge to Defendant Raiklin based on his legal, military and activist background.

Defendant Raiklin correctly cites *Goulmamine* for the rule that opinions may be actionable when the underlying facts are false.  *See* Dkt. 47 at 5 (citing *Goulmamine*, 138 F. Supp. 3d at 660). Defendant Raiklin's brief then repeats one of the falsehoods underlying the claims in this case: that Dr. Adirim broke the law by "architect[ing] the vaccine mandate implementation."  Dkt. 47 at 5.  First, *Goulmamine* demonstrates exactly why Defendant's statements are actionable.  And second, far from being "widely known and undisputed," as Defendant claims, the allegation that Dr. Adirim is the "architect" of the vaccine mandate is simply false.

*Goulmamine* involved CVS employees' statements that the plaintiff-doctor sat in jail, over-prescribed medications, that one patient died from Xanax, that federal agencies investigated him or revoked his medical license, and a litany of other claims.  138 F. Supp. 3d at 656-57.  The court found that CVS's "opinions" actionable because they "may be proven false by an expert witness or because they are laden with factual content and the underlying facts are alleged to be false." *Goulmamine*, 138 F. Supp. 3d at 660.  The court squarely held, "'Opinions' about whether a professional has met a professional standard of care may be defamatory when such 'opinions' could be proven true or false at trial."  *Id.*  Here, Defendant Raiklin's characterization of his statements as "opinions" is not talismanic.  Even if his statements are opinions, they are based on falsehoods relating to articulable legal and medical standards.  Those falsehoods are actionable and will be exposed through discovery and at trial.

Alleging that a doctor commits homicide and mutilates patients is no less defamatory than alleging that a litigator deliberately loses his clients' cases, or that a judge accepts bribes. Defendant Raiklin's allegations that Dr. Adirim committed crimes and violated medical ethics are not protected opinions. The Court may deny Defendant Raiklin's request to dismiss Dr. Adirim's claim for defamation per se on this basis alone.

## II.    Dr. Adirim Adequately Pleads Actual Malice.

Defendant Raiklin next argues that Dr. Adirim did not plead actual malice. To the contrary, Dr. Adirim pled a litany of facts supporting a finding of actual malice and that easily overcome the pleading standard at the motion to dismiss stage.

At the motion to dismiss phase, when the evidence is "still not in," courts "must evaluate whether the plaintiff alleged facts that, if proven, create a plausible inference that a defendant published a defamatory statement with knowledge or reckless disregard of its falsity." *See Fairfax v. CBS Corp.*, 2 F.4th 286, 293 (4th Cir. 2021).

Because actual malice is a subjective inquiry, a plaintiff "is entitled to prove the defendant's state of mind through circumstantial evidence." *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S 657, 668 (1989). "Although actual malice cannot be inferred from ill will or intent to injure alone, '[i]t cannot be said that evidence of motive or care never bears any relation to the actual malice inquiry.'" *Eramo v. Rolling Strong, LLC*, 209 F. Supp. 3d 862, 872 (W.D. Va. 2016) (citing *Connaughton*, 491 U.S. at 668); *see also Duffy v. Leading Edge Prods., Inc.*, 44 F.3d 308, 315 n.10 (5th Cir. 1995) ("[E]vidence of ill will can often bolster an inference of actual malice."); *Sirona Dental, Inc. v. Smithson*, No. 3:14-cv-00714-RJC-DSC, 2016 WL 1263348, at *4 (W.D.N.C. Mar. 31, 2016) (finding actual malice when an employer put an employee on a "hit list" and sought to fire her).

9

Other indicia of actual malice include financial motive, *see Gilmore v. Jones*, No. 3:18-cv-00017, 2021 WL 68684 (W.D. Va. Jan. 8, 2021) ("specific profit motive to publish stories about Plaintiff is permissible because such evidence is relevant to, even if not sufficient to prove, actual malice"), and evidence of a preconceived narrative that ignores new information or demonstrates an intentional avoidance of the truth, *e.g.*, *Harte-Hanks*, 491 U.S. at 693; *Harris v. City of Seattle*, 152 F. App'x 565, 568 (9th Cir. 2005) (quoting 1 Rodney A. Smolla, *Law of Defamation* § 3:71); *Gertz v. Robert Welch, Inc.*, 680 F.2d 527, 539 (7th Cir. 1982); *Goldwater v. Ginzburg*, 414 F.2d 324, 337 (2d Cir. 1969); *Eramo v. Rolling Stone, LLC*, 209 F. Supp. 3d 862, 872 (W.D. Va. 2016).

The Supreme Court of Virginia affirms jury verdicts in favor of defamation victims where, for example, the defendant abandoned all judgment and reason in composing and publishing an advertisement and held no objective basis for the charge and no proper grounds for his statement. *See Jordan v. Kollman*, 269 Va. 569, 581 (2005) (citing *The Gazette, Inc. v. Harris*, 229 Va. 1, 7 (1985)).

Raiklin's ill will and intent to injure Dr. Adirim trumpet his actual malice in this case. Raiklin states his desire that Dr. Adirim not be able "to walk anywhere" without feeling the "wrath of [her] neighbors, friends, relatives, family." Dkt. 45 at ¶38. He calls for "swatting" raids against Dr. Adirim and others. Dkt. 45 at ¶30. He seeks "retribution" and refers to Dr. Adirim, a Jewish woman, as a "good little Nazi."[1] He reads out messages to Dr. Adirim on a podcast stating, "I hope you burn in hell."[2]

---

[1] "The Deep State Hit List with Ivan Raiklin - The Roseanne Barr Podcast #68" (Apple Podcasts, Aug. 21, 2025), https://podcasts.apple.com/tw/podcast/the-deep-state-hit-list-with-ivan-raiklinthe/id1689617956?i=1000671636728 [https://perma.cc/RZ2D-CW8V] (hereinafter, "Rosanne Barr Podcast"), at 08:10. 34:37 - 34:47.

[2] *Id.* at 35:09 - 35:14.

Aside from his stated intent to injure Dr. Adirim, Raiklin's willful blindness to the truth, stoked by financial motive, further supports a finding of actual malice. The evidence of a total absence of troop COVID-19 deaths following the administration of the vaccine was, at the time of Raiklin's story, public information—and easily accessible to anyone like Raiklin who purports to follow the issue. Still, Raiklin's conspiracy theory remains unbending, stoked by the ideological leanings of his employer, America's Future. Raiklin's refusal to acknowledge publicly disseminated, authoritative data, his strong financial motive to advance his lies, and his unambiguous expressions of contempt for Dr. Adirim all demonstrate his reckless disregard for the truth and actual malice in publishing the statements at issue.

As an attorney and former field grade officer, Defendant Raiklin is particularly situated to appreciate the falsity of his legal claims. Rather than hyperbolic statements from an ordinary citizen, Defendant Raiklin's accusations of genocide and mutilation are indictments from someone with professional credentials. As an attorney and former leader within DoD, Defendant Raiklin knew or recklessly disregarded the falsity of his claims that Dr. Adirim broke the law by recommending a vaccine for troops and committed the crimes of genocide and mutilation.

In his Motion, Defendant Raiklin focuses on support for his belief that the COVID vaccines "ended up killing lots of people." Dkt. 47 at 7. But Dr. Adirim's claims in this case are not about whether Defendant Raiklin is right that "lots" of people died. Rather, Count III in the First Amended Complaint identifies three specific statements relating to the legality of Dr. Adirim's actions and whether they constituted defined criminal acts. Dkt. 45 at ¶ 80. Even if the COVID vaccine caused adverse events, and even death in some civilian recipients—facts which Plaintiff does not dispute—this would not form an "objective basis" for Defendant Raiklin's allegations that (1) DOD's vaccine mandate is illegal or (2) Dr. Adirim's actions satisfy the criminal elements

of genocide and mutilation, to include scienter, especially with respect to individuals within DOD. Further, in his Motion, Defendant Raiklin wrongly identifies the 14 probable/demonstrated deaths in the cited study as United States military personnel. Dkt. 47 at 8. The Motion states, "Raiklin believes 14 probable/demonstrated service member deaths causally related to a mandated vaccine to be morally repugnant and criminal. He also considers the death of 14 service members to be 'a lot' and believes Dr. Adirim is morally responsible for and should face consequences for the deaths of these service members." *Id.*

The truth is that the deaths reported in the study came from the general population and there is no demonstrated nexus to the Department of Defense. There is no basis for Defendant Raiklin to tie these events to the mandate on which Dr. Adirim advised. This is another example of Defendant Raiklin's preconceived narrative obscuring the truth, even when it is provided directly to him in writing. This is a strong indicator of actual malice. *Connaughton*, 491 U.S. at 693. In reality, experts thoroughly studied COVID-19 vaccinations within DOD, and **no** servicemember deaths are attributed to the vaccine.[3] But regardless, a study reporting a few deaths in the entire vaccinated U.S. population related to the COVID-19 vaccine does not immunize Defendant Raiklin's allegations that Dr. Adirim is a criminal, unethical, or in any way responsible for those deaths.

For these reasons, the Complaint adequately pleads facts that could support a finding of actual malice. This Court should deny Defendant Raiklin's Motion.

---

[3] These findings are summarized in a July 2025, publicly available report provided to the Committees on Armed Services of the Senate and the House of Representatives. *See* U.S. Department of Defense, Report to the Committees on Armed Services of the Senate and the House of Representatives: Study and Report on Health Conditions of Members of the Armed Forces Developed after Administration of COVID–19 Vaccine, https://health.mil/Reference-Center/Reports/2025/07/25/Covid-19-Vaccination-Study (on file with the United States Government) (last visited Sept. 16, 2025).

III.    **Dr. Adirim States a Claim for Conversion for Defendant Raiklin's Wrongful Exercise of Dominion Over Her Private Correspondence.**

Defendant asserts that Dr. Adirim's private correspondence cannot form the basis of a claim of conversion because it is in an "intangible," digital form.  This position misstates the law. Dr. Adirim's direct messages, and her superior property interest therein, constitute a valid subject for a conversion claim.

In Virginia, conversion is any wrongful exercise of authority over another's goods, depriving the owner of their possession; and any act of dominion wrongfully exerted over property inconsistent with the owner's right.  *See Mackey v. McDannald*, 298 Va. 645, 659 (2020) (citing *United Leasing Corp. v. Thrift Ins. Corp.*, 247 Va. 299, 305 (1994)).  Through the development of British common law to the modern day, letters and personal correspondence form valid subjects for conversion claims.  *See Clendon v. Dinneford*, 172 Eng. Rep. 855, 857 (5 Car. & P. 13) (Exch. Pleas 1831) (upholding claim of conversion with respect to private letters);[4] *Ford v. Wellmont Health Sys.*, 2009 WL 4544099, *7 (W.D. Va. Nov. 30, 2009) (denying motion to dismiss claim of conversion when employer prevented employee from retrieving his personal "letters, pamphlets, books, cabinets, office fixtures and furnishings").

Virginia courts treat digital forms of personal correspondence in the same manner as physical documents.  *See E.I. du Pont Nemours and Co. v. Kolon Indus., Inc.*, 2011 WL 4625760, *5 (E.D. Va. Oct. 3, 2011) (it "makes no sense to conclude that intangible property loses its protection simply because it appears in a copy of a document or on a CD"); *Combined Ins. Co. of*

---

[4] This case is also cited in *Walmart Stores E., LP v. Leverette*, 917 S.E.2d 702, 710 (Ga. June 24, 2025) (jury award of one shilling as example of nominal damages) (citing *Clendon v. Dinneford*, 172 Eng. Rep. 855, 857 (5 Car. & P. 13) (Exch. Pleas 1831)); *see also Conversion*, IRISH LEGAL GUIDE, https://legalguide.ie/conversion-3-2/2/.

*Amer. v. Wiest*, 578 F. Supp. 2d 822, 835 (W.D. Va. 2008) (plaintiff's conversion claim does not fail because the property is an electronic version of a list rather than a hard copy).

Defendant Raiklin's analysis of Virginia law regarding intangible property is incomplete and erroneous. It is true, as Defendant Raiklin notes, that the Virginia Supreme Court upholds conversion claims where "intangible property rights arise from or are merged with a document." *United Leasing Corp. v. Thrift Ins. Corp.*, 247 Va. 299, 305 (1994). But Defendant Raiklin is incorrect in asserting that the "merger" doctrine applies to all intangible property interests. This District analyzed the *United Leasing* holding and found that the Virginia Supreme Court did not delineate the reach of the merger doctrine in *United Leasing*. Rather, the Court explained only that courts uphold conversion actions where intangible property rights and merger exist. Significantly, the Court did not hold that, where intangible property rights are at stake, a conversion action would not lie if there is no merger. *See Kolon Indus.*, 2011 WL 4625760 at *5.

*Kolon* agreed with decisions expanding the scope of conversion, holding, "In this technology-driven world, the value of intangible property cannot be disputed, and a decision to limit conversion to tangible property or intangible property merged in a document symbolizing ownership would leave domain name users, satellite programmers, owners of telephone networks and internet servers, and others similarly situated unable to use an action for conversion for substantial interference with their rights." *Id.*

Accordingly, Defendant Raiklin overstates the merger rule. *Kolon* establishes that intangible property need not be merged with a document evidencing title or ownership for a claim of conversion to lie. This is consistent with Virginia's protection of other intangible property interests where no documents exist, such as the property interest in one's likeness. *Town & Country Properties, Inc. v. Riggins*, 249 Va. 387, 363-64 (1995).

14

The mere existence of Dr. Adirim's private messages in an intangible, digital format does not disqualify them for protection under Virginia's tort of conversion.  If conversion somehow did not also punish a defendant stealing a plaintiff's private digital data, that tort would lose much of its force and relevance in the modern world.  Denying victims of thefts of their digital property a means of civil recovery for suffering that kind of harm would go sharply against the public interest in deterring such invasions of privacy.

## IV. Dr. Adirim Properly Pleads Defendant Raiklin's Wrongful Interference with Her Property and Possessory Interests in Private Messages.

Defendant asserts, primarily in a footnote,[5] that Dr. Adirim's claim of conversion cannot proceed because Dr. Adirim does not possess a sufficient property interest in her direct messages.  Not so.  Under the X Terms of Service, Dr. Adirim maintains a superior possessory interest and a right to control her direct messages with which Defendant Raiklin holds no right to interfere.

Virginia law requires that a plaintiff alleging conversion maintain a "superior right or interest" in the property at issue.  *Pleasant v. Haynes*, No. CH04-248, 2006 WL 1911401, *1 (Va. Cir. Ct. Apr. 25, 2006); *see also Arch Ins. Co. v. FVCbank*, 301 Va. 503, 523 (2022); *United States v. Currituck Grain, Inc.*, 6 F.3d 200, 205 (1993) (analyzing North Carolina law and stating, "a plaintiff in conversion must maintain superior possessory interest through the time of suit; a sale or other loss of that possessory interest extinguishes that party's cause of action for conversion") (citing 18 Am. Jur. Conversion §§ 59, 75).

---

[5] This Court need not consider an argument raised passingly in a footnote.  *Landfall Trust LLC v. Fidelity National Title, Ins. Co.*, 2023 WL 8374731 n.9 (E.D. Va. Dec. 4, 2023) (quoting *F.T.C. v. Tax Club, Inc.*, 994 F. Supp. 2d 461, 471 n.1 (S.D.N.Y. 2014) (It is "well settled" that "a court need not consider arguments relegated to footnotes")).

In the case of copied digital documents, it is necessary that "the purloining of copies of documents would constitute conversion because such action is an act of dominion inconsistent with the true owner's property rights." *Kolon Indus.*, 688 F. Supp. 2d at 455.

The X Direct Message policy states, "You can start a *private* conversation or create a group conversation with anyone who follows you." Dkt. 45-8 at 4 (emphasis added). This policy also describes direct messages as "the private side of X. You can use Direct Messages to have private conversations with people about posts and other content." Dkt. 45-8 at 5. The policy also contains instructions on how to delete Direct Messages. Twitter/X's Privacy Policy applicable at the time of Defendant Raiklin's made direct messages private communications, not public-facing content, with users retaining control over their access and dissemination. The platform provides tools for users to view, delete, and manage their private messages, reinforcing the specific and exclusive nature of the interest at stake. Further, Twitter/X's Privacy Policy specifies third parties with which the platform shares users' information. Dkt. 45-8. That list does not include private individuals with no business arrangement with X.

Dr. Adirim maintains a possessory right in her direct messages that—even if not exclusive—is superior to Defendant Raiklin's. Under the terms of X's policies, Dr. Adirim controlled how the messages are accessed and disseminated, subject to limited, specified exceptions that did not include Defendant Raiklin. Therefore, although X may ultimately own the servers on which Dr. Adirim's direct messages are stored, this relative ownership does not destroy Dr. Adirim's rights with respect to Defendant Raiklin.

Defendants rely on *In re Cap. One Fin. Corp.*, No. 1:25-CV-023 (AJT/WBP), 2025 WL 1570973 (E.D. Va. June 2, 2025), to argue that Dr. Adirim's messages are not "property" for conversion purposes. But their reliance is misplaced. In *Capital One*, the court held that affiliate

16

tracking codes, which are automatically generated browser data assigned by merchants, did not constitute property because they are neither documented nor merged with a symbol of ownership. *Id.* at *11. The *Capital One* plaintiffs failed to show that they held any "clear, definite, undisputed, and obvious property right" in the codes, particularly where they did not create or possess the data and could not control its storage, deletion, or replacement. *Id.*

By contrast, Dr. Adirim authored her Twitter/X direct messages and stored them under her personal credentials. Twitter/X's policies govern the messages and recognize Dr. Adirim's exclusive access and control, subject to limited and specified uses by X. Unlike the passive metadata at issue in *Capital One*, these messages are digitally fixed, retrievable, time-stamped communications more akin to the blueprints in *Outsidewall* or the recruitment list in *Combined Insurance*. Further, Twitter/X's Privacy Policy makes clear users' DMs are not shared without consent, supporting the existence of an individualized and protectable possessory interest. This aligns with Virginia law recognizing conversion of intangible property where the plaintiff maintains the right to control its possession and dissemination. *See United Leasing*, 247 Va. at 305–06; *Outsidewall*, at *5–6.

In sum, Virginia law does not require that the property be tangible, unique, or physically taken to sustain a conversion claim. A decision that the tort of conversion did not apply to stealing direct messages from X would incentivize such theft. What it requires—possessory interest and wrongful dominion—is plausibly and sufficiently alleged here. This Court should deny Defendant Raiklin's Motion.

## **CONCLUSION**

Plaintiff respectfully requests that this Court deny Defendant Raiklin's Motion to Dismiss with respect to all claims.

Dated: September 18, 2025                    Respectfully submitted,

                                             */s/ Kevin T. Carroll*
                                             Kevin T. Carroll, VSB No. 95292
                                             Warren G. Bianchi (*pro hac vice pending*)
                                             **Fluet**
                                             1751 Pinnacle Drive, Suite 1000
                                             Tysons, Virginia 22102
                                             T: (703) 590-1234
                                             F: (703) 590-0366
                                             kcarroll@fluet.law
                                             wbianchi@fluet.law
                                             e-file@fluet.law

                                             *Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 18, 2025, I caused the foregoing to be served on all counsel of record for the Defendants via CM/ECF.

                                             */s/ Kevin T. Carroll*
                                             Kevin T. Carroll, Esq.