# Exhibit B

# The CIA's Updated Executive Order 12333 Attorney General Guidelines

Timely, accurate, and insightful information about the activities, capabilities, plans, and intentions of foreign powers, organizations, and persons, and their agents, is essential to informed decision-making in the areas of national security, national defense, and foreign relations. Collection of such information is a priority objective that the Central Intelligence Agency (CIA) pursues in a vigorous, innovative, and responsible manner that is respectful of the principles upon which the United States was founded, and consistent with the Constitution and applicable statutes and Presidential directives authorizing the CIA's activities, including the National Security Act of 1947, the Central Intelligence Agency Act of 1949 (CIA Act), and Executive Order 12333, *United States Intelligence Activities*.

Under Executive Order 12333, the CIA's collection, retention, and dissemination of information concerning United States persons in furtherance of its intelligence mission are governed by procedures approved by the Director of the CIA and the Attorney General, after consultation with the Director of National Intelligence.  In addition, any participation by CIA officers in organizations in the United States without the disclosure of CIA affiliation occurs only in limited situations in accordance with established and approved procedures.  Collectively, these procedures are often referred to as the "Attorney General Guidelines."  In January 2017, the Director of the CIA and the Attorney General updated the CIA's Attorney General Guidelines to reflect changes in law, technology, and practice since the Attorney General Guidelines were last significantly updated in the 1980s.  This fact sheet explains and summarizes several key provisions of the revised Attorney General Guidelines.

While the revised Attorney General Guidelines provide the framework for ensuring that the CIA engages in its foreign intelligence, counterintelligence, and covert action missions in support of national security objectives in a manner that respects Americans' privacy rights and civil liberties, it is critical to note that the Attorney General Guidelines represent only one aspect of the authorizations and restrictions on the CIA's intelligence activities.  The CIA's activities are primarily focused outside the United States, but they must nonetheless comply with a variety of other United States laws, including but not limited to, the National Security Act, the CIA Act, the Foreign Intelligence Surveillance Act, and the Privacy Act, as well as Executive Order 12333 and Presidential directives such as Presidential Policy Directive 28.  These Attorney General Guidelines do not, and should not be interpreted to, authorize activities that are otherwise prohibited by United States law.

In addition to the Attorney General Guidelines, the CIA has internal regulations that govern CIA's intelligence activities.  These internal regulations require various levels of approvals to initiate particular intelligence activities and may impose additional requirements on the conduct of such activities.  If duly authorized intelligence activities include collecting information concerning United States persons, participating in organizations in the United States, or other areas governed by the Attorney General Guidelines, then CIA employees must comply with both these internal regulations and the requirements found in these Attorney General Guidelines.

## Authorization, Purpose, and Key Limitations

Sections 1 through 3 of these revised Attorney General Guidelines explain the purpose of the Attorney General Guidelines, summarize the authorities and responsibilities of the CIA, and identify several general principles that apply to the CIA's intelligence activities overall.  The CIA is authorized by statute and directed by the President to collect intelligence through a variety of means, including from human sources.  In short, the CIA conducts espionage.  The CIA is, however, also an all-source intelligence agency that collects and incorporates intelligence information from a variety of other sources and methods to produce all-source analysis.  CIA intelligence includes information ranging from relevant publicly available information (referred to as Open Source Intelligence, or OSINT) to Geospatial Imagery Intelligence (referred to as Imagery, or GEOINT), Measurement and Signature Intelligence (MASINT), and Signals Intelligence (SIGINT).

While statutes and Executive Order 12333 provide the general authority for the CIA to conduct intelligence activities, the CIA does not independently determine its intelligence collection priorities.  The CIA's intelligence activities are instead conducted in response to intelligence requirements established by the President and the CIA's other intelligence consumers.  Specifically, the Director of National Intelligence approves the [National Intelligence Priorities Framework (NIPF)](), which establishes national intelligence priorities that reflect the guidance of the President and the National Security Advisor with input from Cabinet-level and other senior government officials.  The CIA's duly authorized intelligence activities are conducted in response to the NIPF priorities or other intelligence requirements imposed by the President and other intelligence consumers.

Under the framework established by Executive Order 12333, the CIA's intelligence activities are primarily focused outside the United States.  The FBI is responsible for coordination of clandestine collection of foreign intelligence through human sources or human-enabled means and counterintelligence activities inside the United States.  The CIA can, however, generally cooperate with the FBI to collect foreign intelligence within the United States, subject to the restrictions imposed by statute, Executive Order 12333, the Attorney General Guidelines, and other legal and policy requirements.  Specifically, the National Security Act prohibits the CIA from exercising police or subpoena powers or otherwise engaging in law enforcement or internal security functions, with the exception of the security protective officers who protect CIA facilities within a limited jurisdiction pursuant to the CIA Act.  If, for example, the FBI has a cooperative relationship with an individual inside the United States who provides foreign intelligence information, the FBI may appropriately consult with the CIA regarding the relationship, and the CIA may continue the relationship for intelligence purposes should the individual travel overseas.

The CIA is also obligated to report to the Department of Justice potential violations of federal criminal law by employees and potential violations of certain federal criminal laws by non-CIA personnel that it incidentally acquires while seeking foreign intelligence information.  For example, if in the course of collecting foreign intelligence information about an adversarial foreign government leader, the CIA learned that a United States citizen were engaged in trafficking controlled munitions or technology to the foreign government, the CIA must report that information to the Department of Justice as a potential violation of federal criminal law.

Executive Order 12333 recognizes that in conducting its authorized activities the Intelligence Community, including the CIA, will collect, retain, and disseminate information concerning United States persons, but requires that such activities be conducted in accordance with the limitations set forth in the order and in conformance with the Attorney General Guidelines.  For instance, the Intelligence Community must use the least intrusive collection techniques feasible when collecting information within the United States or directed against United States persons abroad.

In addition, the CIA may not collect or maintain information for the sole purpose of monitoring the lawful exercise of rights secured by the Constitution or United States law, including First Amendment rights.  For example, the CIA could not collect the public statements of or about a United States person merely because he or she was making critical statements regarding the United States government.  If, however, the CIA were collecting intelligence information about a United States person engaged in international terrorism, the CIA would not have to ignore or remove from its systems public statements made by that individual, because the collection occurred during the course of a duly authorized intelligence activity.  The explicit recognition of this principle in the Attorney General Guidelines reflects the CIA's enduring commitment to operate in accordance with the United States Constitution and other law.

## Collection Targeting United States Persons

Section 4 of the Attorney General Guidelines governs the CIA's collection efforts when they are directed at United States persons.  As previously described, collection directed at United States persons may only be conducted in the course of a duly authorized intelligence activity.  Collection against a United States person must employ the least intrusive techniques feasible that will still obtain the required information in a reliable and timely manner.  More intrusive techniques require higher-level approvals within the CIA and, at times, by other government officials and the judicial branch and must be documented in writing.  The Attorney General Guidelines break down collection techniques into three categories.

***Basic collection*** generally involves the least intrusive types of collection.  Basic collection includes the collection of publicly available information (e.g., searching the public Internet to determine the significance of a United States phone number recovered from a known terrorist's cell phone) or collecting information with the consent of the United States person in question (e.g., asking them directly for information about themselves).  Because the collection of these kinds of information do not represent a significant intrusion on an individual's privacy rights, and in certain circumstances involve no such intrusion at all, the Attorney General Guidelines do not require special approvals for this type of collection. However, any such collection must still be conducted in accordance with the restrictions in these Attorney General Guidelines and other agency policies.  Basic collection must be for an authorized purpose, such as foreign intelligence or counterintelligence, and limited to information reasonably necessary to support that purpose.

***Standard collection*** targeting a United States person includes any collection technique directed at a United States person that is not one of the defined forms of basic collection or a special collection

3

technique (described in the previous and following sections).  Examples of standard collection techniques include requesting another government agency to provide their records about a United States person, asking a current CIA asset about the activities of a United States person living in a foreign country, or asking a foreign government for information about the same person.  All standard collection techniques require approval by designated CIA officials, but there may be additional restrictions imposed by these Attorney General Guidelines or CIA policies.  For example, the CIA may ask the FBI to conduct physical surveillance (i.e., follow a person around) of a United States person in the United States because the individual is reasonably assessed to be involved in espionage or international terrorism.  However, the CIA is barred from conducting such physical surveillance in the United States itself except in narrow circumstances where the target of the physical surveillance is a current or former CIA employee or contractor, or someone applying to be a CIA employee or contractor.

The use of ***special collection*** techniques is highly restricted.  A special collection technique is any technique that would require a warrant if the technique were used in the United States for law enforcement purposes.  Electronic surveillance or a search of a home or office are examples of special collection techniques.  With narrowly defined exceptions regarding testing and training, the <u>CIA may not use special collection techniques in the United States</u>. The CIA is, however, permitted to ask another federal agency to perform special collection techniques in the United States under that agency's legal authorities.  The CIA may also provide technical equipment or knowledge to another federal agency in conducting authorized special collection in the United States with the approval of the CIA's General Counsel.  The CIA may conduct special techniques outside the United States that target a United States person <u>only</u> with the approval of the Director of the CIA (or his designee), the CIA General Counsel, the Attorney General, and (where applicable) the Foreign Intelligence Surveillance Court.

## Additional Protections for Bulk and Unevaluated Information

An important aspect of the revised Attorney General Guidelines are the provisions that govern the processing and handling of information before it is fully evaluated.  Even if the CIA never intended to target a particular United States person, the CIA may nonetheless incidentally acquire such information in the course of conducting its authorized intelligence activities.  Therefore, collectors must take reasonable steps to limit the information collected to only that which is necessary to achieve the purpose of the collection.  For example, if the CIA obtained a hard drive previously used by a foreign state-sponsored hacking group, that hard drive could contain both information about the hackers and information about United States persons the hackers had collected themselves.  Depending upon the amount and nature of information in the hard drive, the CIA might be able to evaluate the information promptly to obtain foreign intelligence, or it might take a great deal of time to determine what portions of the data constitute foreign intelligence information or involve United States persons.

Sections 5 and 6 of the new Attorney General Guidelines include specific approval requirements for handling datasets that cannot be promptly evaluated for their intelligence value, whether or not the collection activity targeted a United States person. When approving the collection or ingestion of such data, specifically designated officials must document the purpose of the collection activity, how the data was acquired, what steps were taken to limit the collection to the smallest subset containing the information necessary to achieve the purpose of the collection, and further determine how sensitive the acquired data is so that appropriate controls regarding access, querying, and retention may be imposed.

These protections respond to a range of privacy concerns regarding the handling and use of unevaluated data, regardless of how or where the data is acquired. The protections apply to "bulk" collection activities, which are activities that – due to technical or operational considerations – acquire data without the use of specific identifiers or selection terms such as names, phone numbers, or e-mail addresses. The protections apply equally to any other intelligence collection activity that results in the acquisition of a large quantity of information, where the CIA cannot promptly determine whether that information may be retained for a permissible purpose. The specific protections applied to the unevaluated dataset will depend upon the nature of the collected information.

More specifically, the revised Attorney General Guidelines impose stricter restrictions – referred to as "exceptional handling requirements" – on unevaluated information that is inherently more sensitive. For example, telephone or electronic communications acquired without the consent of one of the communicants are subject to exceptional handling requirements. Approving officials will also subject other datasets to exceptional handling requirements if they determine the data sets contain information that identifies United States persons, and that information is significant in volume, proportion, or sensitivity. For example, a foreign government repository of records may include sensitive records pertaining to Americans, and if the CIA obtains those records, CIA officials may determine that such a dataset warrants the additional protections provided by the exceptional handling requirements.

Data subject to exceptional handling requirements must be segregated from other kinds of data, and only CIA employees who have completed training in the handling of such sensitive data may be granted access to it. CIA employees may query this data to retrieve information about a United States person only for reasons related to one of the CIA's duly authorized activities, as previously described, and, to the extent practicable, the CIA employee must make a statement explaining the purpose with the the query. Absent an imminent threat to life or a waiver issued by the Director of the CIA – granted only after consultation with the CIA's General Counsel and the CIA's Privacy and Civil Liberties Officer (PCLO), and reported to the CIA's Congressional oversight committees – the CIA must destroy any unevaluated information subject to the exceptional handling restrictions no later than five years after the information is made available to CIA personnel for operational or analytical use. This destruction requirement ensures that CIA has adequate time to properly identify foreign intelligence information that may not be apparent when information is first ingested into the CIA's systems, while also ensuring that such sensitive information, which might include information

concerning United States persons, does not remain on the CIA's systems for an indefinite period of time.

Protections also apply to data that is unevaluated, but is of less sensitive nature than data subject to the exceptional handling rules.  For example, a foreign government's repository of records may include information that the CIA cannot promptly evaluate, but would not include the content of telephone or electronic communications.  Such routine unevaluated data must nonetheless be segregated from information CIA officers have already evaluated, such as information found to constitute foreign intelligence.  Queries of routine unevaluated data must be reasonably designed to retrieve information related to a duly authorized activity of the CIA.  Routine unevaluated data must be destroyed prior to 25 years from the date the information was made available for operational or analytic use

## Retention and Dissemination

The Attorney General Guidelines permit the retention of evaluated information concerning United States persons only if the information falls within one of several specified categories. In some cases, this evaluation process may occur contemporaneously when the information is first acquired.  For example, a CIA officer may ask a CIA asset about the known contacts of a particular foreign individual. If the asset gave the names of any United States person information in response, the CIA officer would only incorporate the United States person information into a subsequent report or cable if the United States person information was foreign intelligence or counterintelligence information or qualified under one of the other retention categories.  Alternatively, a CIA officer engaged in analysis might come across a reference to a United States person in a segregated database of unevaluated information, but may only take that information out of the database and use it in a report if it may be retained under these same criteria.  Even when the information concerning the United States person may be retained, the actual identity of that United States person may only be disseminated outside the Intelligence Community when the identity is necessary, or reasonably may become necessary, to understand or act upon the information.

Access limitations and other protections also apply to evaluated information that has been retained.  Access to such information must be limited to those who have a need to know related to their duly authorized activities.  Queries of evaluated retained information in CIA systems must also be limited to queries reasonably designed to retrieve information related to the CIA's authorities and responsibilities.

Consistent with the Executive Order and the need to share relevant intelligence information, information concerning United States persons may be disseminated to appropriate elements of the Intelligence Community.  Such information, whether unevaluated or evaluated, must be handled subject to the Attorney General-approved Guidelines of the Intelligence Community element receiving the information.  Information that has been determined to meet the retention criteria may also be disseminated outside the Intelligence Community, including to the President, the National

Security Council, other intelligence consumers within the Executive Branch, relevant Congressional Committees, or foreign governments.

Special rules apply to disseminations to foreign entities, however, including specified approval levels. Such disseminations require a review and written determination regarding the potential risks, including the potential harm to identified individuals, resulting from the dissemination. Foreign entities must agree to CIA specified restrictions on further use and dissemination.

The Guidelines further permit the dissemination of unevaluated information outside of the Intelligence Community, but only with the approval of the Director of the CIA or designee, concurrence of the CIA's General Counsel and PCLO, and only after weighing the anticipated risks and benefits and determining that such a dissemination is the only reasonable way to evaluate or use the information. For example, under this provision, the CIA could work with a trusted international partner against a high-priority intelligence target of joint interest, or share a limited amount of unevaluated information with an individual or group that speaks a foreign dialect unfamiliar to CIA personnel in order to determine whether the content contained foreign intelligence information. The receiving entity must further provide appropriate assurances regarding their handling of the material with respect to the potential risks resulting from dissemination.

## Undisclosed Participation in Organizations in the United States

The Attorney General Guidelines provide requirements for participation in organizations in the United States for the purpose of conducting lawful duly authorized intelligence activities. The Attorney General Guidelines do not apply to CIA employees joining or participating in organizations solely for personal purposes on their own time and at their own expense. In the rare case that there is any question about the nature of an employee's participation and whether the participation would be considered personal or on behalf of the CIA, then the participant should consult with the Office of General Counsel (OGC) for guidance.

The Attorney General Guidelines provide guidance for when a CIA employee may or may not participate in an organization and what type of information the employee may collect. Unless additional approvals are given under Section 4 of the Attorney General Guidelines, CIA employees may only collect publicly available or volunteered information concerning United States persons in the course of their undisclosed participation. Additional approvals would be required, for instance, if a CIA officer sought to question a specific individual of the organization to obtain specific information.

CIA employees may attend professional conferences, forums, and other events generally open to the public. CIA officers may need, for example, to acquire further training or education relevant to their duties or to acquire continuing education towards a professional certification. If an organization requires the disclosure of one's employer, then CIA officers must comply unless they have received the appropriate approval and the nondisclosure is in furtherance of one of the specified purposes mentioned in the Attorney General Guidelines.

Even when CIA employees participate in an organization without disclosing their CIA affiliation, they may not participate for purposes of influencing the activity of the organization or its members. For example, a CIA officer who had not disclosed their affiliation could not propose a new policy for the organization, suggest a new course of action, attempt to convince members to modify an established practice, or otherwise in any way attempt to influence the activities of the organization. A very limited exception to this rule occurs only when the organization in question is both reasonably believed to be acting on behalf of a foreign power and is composed primarily of individuals who are not United States persons. Attempts to influence such an organization in this limited scenario require the approval of the Director of the CIA and the concurrence of the CIA's General Counsel.

## Compliance and Oversight

Every CIA officer shares in the CIA's solemn obligation to protect fully the legal rights of all United States persons, including freedoms, civil liberties, and privacy rights guaranteed by federal law. The CIA recruits exceptionally talented individuals from diverse backgrounds with interests in national security, public service, and world affairs. Our officers are motivated to accomplish the CIA's mission, which is to collect and analyze foreign intelligence and counterintelligence, and to conduct covert action at the direction of the President. CIA officers are not motivated by a desire to unreasonably intrude into the private lives of their fellow citizens, and do not seek to do so.

This commitment is reflected in the CIA's governing ethos, which states in part that "we uphold the highest standards of lawful conduct. We are truthful and forthright, [and we] maintain the Nation's trust through accountability and oversight." Accountability and oversight begin with the professional dedication of line personnel and first-level supervisors, who help to ensure a culture of lawful vigilance.

CIA activities are continually reviewed by a variety of internal and external oversight bodies. Within the CIA, OGC and the Office of Inspector General (OIG) are each led by an officer who, like the Director, is appointed by the President of the United States and confirmed by the Senate. A substantial percentage of OGC attorneys are collocated with analysts, operators, and other professional personnel within the CIA's Mission Centers and other CIA elements. OIG accomplishes its mission to provide objective oversight and detect fraud, waste, and abuse, through audits, inspections, and investigations. CIA officers, regardless of grade or position, are encouraged to consult with OGC and OIG as appropriate, and to report any suspected violations of law or policy. The CIA respects whistleblower protection within the Intelligence Community, and does not tolerate reprisals or the threat of reprisals against employees on the basis of protected disclosures.

The CIA's PCLO provides advice and assistance to senior CIA officials regarding privacy and civil liberties concerns, including those related to these Procedures. The CIA recently re-established this position as a dedicated full-time appointment, recognizing its importance to the CIA's mission. The PCLO is taking a leading role in the public discussion regarding these Procedures.

Within the Executive Branch, the CIA's accountability begins with the President of the United States and the National Security Council. The CIA reports to the President in furtherance of its national security responsibilities, and is prohibited from engaging in any activities for purposes of affecting or interfering with the domestic political process. The CIA also engages with and is accountable to independent entities within the Executive Branch, including the President's Intelligence Advisory Board, the Intelligence Oversight Board, and the Privacy and Civil Liberties Oversight Board.

The accomplishment of the CIA's mission is enhanced by engagement with, and accountability to, other executive branch agencies. Within the Intelligence Community, for example, the CIA is governed by directives issued by the Director of National Intelligence. CIA activities are also reviewed by the Department of Justice in various contexts, such as the National Security Division's audits of intelligence activities authorized by the Foreign Intelligence Surveillance Act, and the Office of Legal Counsel's review of important legal issues relevant to the CIA's activities. The CIA worked extensively with the Department of Justice and the Office of the Director of National Intelligence in developing these Procedures.

Ultimately, the CIA is accountable to the American people. The CIA gives meaning to this oversight, in part, through its legal obligation to keep Congress fully and currently informed of intelligence activities. The CIA regularly engages with Congressional leadership, the Senate Select Committee on Intelligence, and the House Permanent Select Committee on Intelligence. This oversight is also realized through the public appraisal of CIA activities and governance structures, including through public review of the Attorney General Guidelines released today. Our hope is that transparency initiatives such as these will lead to greater public understanding of the CIA's mission, and help further the important public discussion regarding the necessary and appropriate role of intelligence agencies within the United States.